**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNY LISETTE FLORES, *Plaintiff-Appellee,* v. JEFFREY A. ROSEN, Acting Attorney General; CHAD F. WOLF; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION, *Defendants-Appellants.* | No. 19-56326 D.C. No. 2:85-cv-04544-DMG-AGR OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted May 19, 2020
San Francisco, California

Filed December 29, 2020

Before:  William A. Fletcher, Marsha S. Berzon, and
Milan D. Smith, Jr.,[*] Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[**]

### Immigration

In an action involving the *Flores* Agreement, a 1997 settlement agreement between the United States and a class of all minors subject to immigration detention ("the Agreement"), the panel affirmed in part and reversed in part a district court order enjoining regulations represented as implementing the Agreement, and affirmed the district court's denial of the government's motion to terminate the Agreement.

By the Agreement's terms, it terminates after the "publication of final regulations implementing this Agreement."  In 2019, the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS") issued a final rule entitled "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children ("Final Rule"), which

---

[*] Pursuant to Ninth Circuit General Order 3.2.h, Judge M. Smith, Jr. was drawn by lot to replace Judge Tashima, who has recused himself. Judge M. Smith, Jr. has reviewed the record and briefs in this case and listened to the oral argument before the prior panel.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

comprises two sets of regulations: one issued by DHS and one by HHS. The district court entered a permanent injunction enjoining enforcement of the Final Rule in its entirety.

As to the HHS regulations relating to unaccompanied minors, the panel held that the provisions are generally consistent with the Agreement, and may take effect, with two exceptions. First, the panel concluded that the provision allowing the Office of Refugee Resettlement ("ORR") to place an unaccompanied minor in a secure facility (*e.g*., a state or county juvenile detention facility) if the minor is "otherwise a danger to self or others" is inconsistent with the Agreement. The panel explained that the relevant statutory provision states that a minor shall not be placed in a secure facility "*absent* a determination that the child poses a danger to self or others," not that ORR may place a minor in a secure facility whenever it makes that determination. Second, the panel concluded that the portion of the bond hearing regulations providing a hearing to unaccompanied minors held in secure or staff-secure placements *only if* they request one is inconsistent with the Agreement, which provides unambiguously for a bond hearing "unless the minor indicates . . . that he or she refuses such a hearing."

Although the panel held that the majority of the HHS regulations may take effect, it also held that the district court did not abuse its discretion in declining to terminate the portions of the Agreement covered by those regulations, noting that the government moved to terminate the Agreement in full, not to modify or terminate it in part.

As to the DHS regulations regarding initial apprehension, processing, and custody of both unaccompanied and accompanied minors, the panel held that some of the provisions are consistent with the Agreement

and may take effect: namely, the provisions regarding transfer of unaccompanied minors from DHS to HHS and those regarding DHS custodial care immediately following apprehension.

However, the panel held that the remaining regulations relating to accompanied minors depart from the Agreement in two principal, related ways: (1) they limit the circumstances in which accompanied minors may be released, and (2) they provide for the detention of families together in facilities licensed not by states but by Immigration and Customs Enforcement itself. The panel explained that these departures undermine the Agreement's core "presumption in favor of releasing minors" and its requirement that those not released be placed in "licensed, non-secure facilities that meet certain standards." Explaining that these regulations dramatically increase the likelihood that accompanied minors will remain in government detention indefinitely, the panel observed that effecting this change was one of the principal features of the Final Rule, and that the government strongly disagrees with the court's holding in *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ("*Flores I*"), that the Agreement encompasses accompanied minors.

Because the panel concluded that the differences between the regulations and the Agreement are substantial and affect the central protections afforded by the Agreement, the panel rejected the government's argument that the Agreement terminated by its own terms.

Finally, the panel held that the district court did not abuse its discretion in denying the government's motion to terminate the Agreement as to accompanied minors, as the government had not demonstrated that changed circumstances justified termination. First, the panel rejected

the government's contention that, by codifying the Agreement's protections for unaccompanied minors, Congress had signaled it was leaving the treatment of accompanied minors to DHS's discretion. The panel explained that it had already held to the contrary in *Flores I*, where the court determined that the creation of statutory rights for *unaccompanied* minors does not make application of the Agreement to *accompanied* minors impermissible.

Second, addressing the government's contention that the Final Rule is a fundamental change in law justifying termination of the Agreement, the panel rejected the notion that the executive branch can unilaterally create the change that it then offers as the reason it should be excused from compliance. Although the Agreement contemplates termination upon the promulgation of *consistent* regulations, the panel explained it does not follow that the executive branch could bring about termination through the promulgation of *inconsistent* regulations.

Third, the panel rejected the government's argument that an unprecedented increase in family migration warrants termination of the Agreement. The government has three primary options when DHS encounters an accompanied minor: (1) release all family members, (2) detain the parent(s) or legal guardian(s) and release the minor to a parent or legal guardian, or transfer the minor to HHS as an unaccompanied minor, or (3) detain the family together at an appropriate family detention center. The panel observed that the government prefers the third option, but that the Agreement flatly precludes that approach. The panel explained that, if the only problem were a lack of licensed facilities to hold accompanied minors, then modification of the Agreement might be warranted, but the government sought a much more comprehensive change by jettisoning

the Agreement's release mandate for accompanied minors except in narrow circumstances.

Even if the government has legitimate justifications for detaining adults, the panel concluded that it had not shown why it must also detain accompanying minors. The panel noted that the Final Rule suggests disingenuously that family separation is not preferable because it has generated significant litigation. The panel explained that the litigation cited relates to *forcibly* separating parents and children, but that nothing in the Agreement requires the government to take children against their parents' will. Instead, the Agreement provides for the release of a minor to certain adult relatives and, if none of those relatives are available, provides a mechanism for parents to designate another individual or entity.

Fourth, the panel rejected the government's contention that flaws in the certified class of Plaintiffs constitute changed circumstances warranting termination of the Agreement. Observing that *Flores I* held that the government waived its ability to challenge the class certification when it settled the case and did not timely appeal the final judgment, the panel explained that the government cited no authority supporting its suggestion that the evolution of class certification standards warrants termination, particularly when the government has never moved to decertify or modify the class.

**COUNSEL**

August E. Flentje (argued), Special Counsel to the Assistant Attorney General; Sarah B. Fabian, Senior Litigation Counsel; William C. Silvis, Assistant Director; Jeffrey Robins, Deputy Director; William C. Peachey, Director; Joseph Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Carlos R. Holguin (argued) and Peter A. Schey, Center for Human Rights & Constitutional Law, Los Angeles, California; Holly S. Cooper, Co-Director, Immigration Law Clinic, University of California Davis School of Law, Davis, California; Leecia Welch, Neha Desai, Poonam Juneja, and Freya Pitts, National Center for Youth Law, Oakland, California; Kevin Askew, Orrick Herrington & Sutcliffe LLP, Los Angeles, California; for Plaintiff-Appellee.

Elizabeth B. Wydra, Brianne J. Gorod, and Dayna J. Zolle, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Members of Congress.

James H. Hulme, Arent Fox LLP, Washington, D.C.; David L. Dubrow and Melissa Trenk, Arent Fox LLP, New York, New York; Justin A. Goldberg, Arent Fox LLP, Los Angeles, California; for Amici Curiae American Pediatric Association, American Pediatric Society, American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, American Academy of Pediatrics California Chapter, American Academy of Pediatrics Pennsylvania Chapter, American Academy of Pediatrics Texas Chapter, American Association for Psychoanalysis in Clinical Social Work, American Medical Association,

American Professional Society on the Abuse of Children, American Psychiatric Association, American Psychoanalytic Association, Association of Medical School Pediatric Department Chairs, California Medical Association, California Psychiatric Association, Center for Law and Social Policy, Center for Youth Wellness, Children's Defense Fund, Doctors for America, Lutheran Immigration and Refugee Service, March of Dimes, National Association of Pediatric Nurse Practitioners, National Association of Social Workers, National Education Association, Society for Pediatric Research, Women's Refugee Commission, First Focus On Children, Save The Children Action Network Inc., Save The Children US, United States Fund for UNICEF, and Zero To Three.

Amanda Aikman, Jennifer K. Brown, and Natasha Greer Menell, Morrison & Foerster LLP, New York, New York, for Amici Curiae Interfaith Group of 40 Religious and Interreligious Organizations.

Alexis Coll-Very, Redwood City, California; Molly L. Leiwant, New York, New York; Wendy Wylegala, Kids in Need of Defense, New York, New York; for Amici Curiae Kids in Need of Defense, Capital Area Immigrants' Rights Coalition, Catholic Legal Immigration Network Inc., Florence Immigrant and Refugee Rights Project, Immigrant Children Advocates' Relief Efforts, International Rescue Committee, Legal Services for Children, National Immigrant Justice Center, Northwest Immigrant Rights Project, Public Counsel, and Young Center for Immigrant Children's Rights.

Sarah P. Alexander, Constantine Cannon LLP, San Francisco, California, for Amici Curiae Human Rights Watch and Amnesty International USA.

Aaron X. Fellmeth, Arizona State University, Sandra Day O'Connor College of Law, Phoenix, Arizona; W. Warren H. Binford, Willamette University College of Law, Salem, Oregon; Blaine I. Green and Erica Turcios Yader, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California; Michael Garcia Bochenek, New York, New York; Stella Burch Elias, University of Iowa College of Law, Iowa City, Iowa; Ian M. Kysel, Cornell Law School, Ithaca, New York; for Amici Curiae Legal Scholars and Nongovernmental Organizations.

Joseph P. Lombardo, Sara T. Ghadiri, and Eric S. Silvestri, Chapman and Cutler LLP, Chicago, Illinois, for Amici Curiae Children's Advocacy Organizations.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Sarah E. Belton, Supervising Deputy Attorney General; Virginia Corrigan, Rebekah A. Fretz, Vilma Palma Solana, and Julia Harumi Mass, Deputy Attorneys General; California Department of Justice, Oakland, California; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Kwame Raoul, Attorney General, Chicago, Illinois; Aaron M. Frey, Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General, Carson City, Nevada; Gurbir S. Grewal, Attorney General, Trenton, New Jersey, Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney

General, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Olympia, Washington; Karl A. Racine, Attorney General, Washington, D.C.; for Amici Curiae States of California, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

Michael N. Feuer, City Attorney; Kathleen Kenealy, Valerie L. Flores, Michael Dundas, and Danielle L. Goldstein, Attorneys; Office of the City Attorney, Los Angeles, California; Donna R. Ziegler, County Counsel, Oakland, California; Craig Labadie, City Attorney, Albany, California; Esteban A. Aguilar Jr., City Attorney, Albuquerque, New Mexico; Joanna C. Anderson, City Attorney, Alexandria, Virginia; Nina R. Hickson, City Attorney, Atlanta, Georgia; Anne L. Morgan, City Attorney, Austin, Texas; Andre M. Davis, City Solicitor, Baltimore, Maryland; Farimah F. Brown, City Attorney, Berkeley, California; Eugene O'Flaherty, Corporation Counsel, Boston, Massachusetts; Nancy E. Glowa, City Solicitor, Cambridge, Massachusetts; Mark A. Flessner, Corporation Counsel, and Benna Ruth Solomon, Deputy Corporation Counsel, Chicago, Illinois; William R. Hanna, Director of Law, Cleveland Heights, Ohio; Zach Klein, City Attorney, Columbus, Ohio; Sharon L. Anderson, County Counsel, Martinez, California; Jessica M. Scheller, Assistant State's Attorney, Chicago, Illinois; Heather M. Minner, City Attorney, Cupertino, California; Ronald C. Lewis, City Attorney, Houston, Texas; Charles Parkin, City Attorney,

Long Beach California; Margaret L. Carter, O'Melveny & Myers LLP, Los Angeles, California; Michael P. May, City Attorney, Madison, Wisconsin; Leslie J. Girard, County Counsel, Salinas, California; James E. Johnson, Corporation Counsel, New York, New York; Barbara J. Parker, City Attorney, Oakland, California; Marcel S. Pratt, City Solicitor, Philadelphia, Pennsylvania; Cris Meyer, City Attorney, Phoenix, Arizona; Yvonne S. Hilton, City Solicitor, Pittsburgh, Pennsylvania; Tracy P. Reeve, City Attorney, Portland, Oregon; Jeffrey Dana, City Solicitor, Providence, Rhode Island; Susan Alcala Wood, City Attorney, Sacramento, California; Dennis J. Herrera, City Attorney, San Francisco, California; Richard Doyle, City Attorney, San Jose, California; James R. Williams, County Counsel, San Jose, California; Dana McRae, County Counsel, Santa Cruz, California; Peter S. Holmes, City Attorney, Seattle, Washington; Francis X. Wright Jr., City Solicitor, Somerville, Massachusetts; Michael Jenkins, City Attorney, Best Best & Krieger LLP, Manhattan Beach, California; for Amici Curiae 37 Cities and Counties.

## OPINION

BERZON, Circuit Judge:

We consider again the consent decree incorporating the *Flores* Agreement, a 1997 settlement agreement between the United States and a class of all minors subject to immigration detention ("the Agreement"). The Agreement established nationwide standards for the "detention, release, and treatment of minors" by U.S. immigration authorities. Agreement ¶ 9. By the Agreement's own terms, it terminates after the government's "publication of final regulations

implementing this Agreement." *Id*. ¶ 40 (as modified by Stipulation, Dec. 7, 2001).

In 2019, the government issued final regulations represented as implementing, and thus terminating, the Agreement. The new regulations largely mirror the Agreement's protections for unaccompanied minors, but they significantly reduce the limits on detention for minors taken into custody with a family member or guardian ("accompanied minors"). The district court concluded that the new regulations, on the whole, were inconsistent with the Agreement. It enjoined the regulations from taking effect and denied the government's motion to terminate the Agreement.

We hold that the provisions of the new regulations relating to unaccompanied minors are generally consistent with the Agreement and may take effect, with two exceptions. Additionally, some of the regulations regarding initial detention and custody of both unaccompanied and accompanied minors are consistent with the Agreement and may take effect.

The remaining new regulations relating to accompanied minors depart from the Agreement in several important ways. We therefore affirm the district court's order enjoining those regulations. Additionally, the district court correctly concluded that the Agreement was not terminated by the adoption of the regulations. Finally, the district court did not abuse its discretion in denying the government's motion to terminate the Agreement, as the government has not demonstrated that changed circumstances, such as an increase in family migration, justify terminating the Agreement's protections.

**I.**

## A.  The *Flores* Agreement

This case stems from a 1985 lawsuit filed on behalf of a class of minors detained by U.S. immigration authorities. After considerable litigation, the parties negotiated the Agreement, entered by the district court as a consent decree in January 1997. The Agreement applies to "[a]ll minors who are detained in the legal custody of the INS," Agreement ¶ 10, and so covers both unaccompanied and accompanied minors, *Flores v. Lynch*, 828 F.3d 898, 905–08 (9th Cir. 2016) ("*Flores I*").[1] It "creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores I*, 828 F.3d at 901.

The Agreement anticipated that its terms would be adopted into regulations. Paragraph 9 specifies that "[w]ithin 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation" and that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." Agreement ¶ 9. Paragraph 40 of the Agreement originally included a termination date, but in 2001 the parties stipulated to extend the Agreement. As modified, paragraph 40 provides that "[a]ll terms of this agreement shall terminate *45 days following defendants' publication of final regulations implementing this Agreement*." The government

---

[1] Although the Agreement refers to "INS," the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS"). *See Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017) ("*Flores II*").

did not publish final regulations intended to implement the Agreement until August 2019.

The Agreement imposes several substantive requirements on the government's detention of minors. It requires the government to "hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors" and to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs." Agreement ¶¶ 11, 12A. Ordinarily, within three days after apprehending and detaining a minor, the government must choose between two options for placing the minor. *Id.* ¶ 12A. The first option, discussed in paragraph 14, is releasing the minor to a parent, legal guardian, adult relative, or another "capable and willing" designated adult or entity. Release is mandatory if the minor presents neither a flight nor a safety risk and a qualified custodian is available. Alternatively, under paragraph 19, the minor may be placed in a facility "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." *Id.* ¶ 6. Licensed facilities must be "non-secure as required under state law." *Id.*

There are some exceptions to the Agreement's placement and time requirements. For instance, a minor may be placed in a secure juvenile detention facility under paragraph 21 in limited circumstances, such as when the minor has been charged with a crime. *Id.* ¶¶ 12A(1), 21. And "in the event of an emergency or influx of minors into the United States," the requirement that minors be placed within three days is relaxed, provided that "the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible." *Id.* ¶ 12A(3). An "influx of minors" occurs if

"more than 130 minors" are awaiting placement in a non-secure licensed facility under paragraph 19. *Id.* ¶ 12B.

Finally, the Agreement mandates that a minor in deportation proceedings who is not released is entitled to a bond hearing before an immigration judge, "unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." *Id.* ¶ 24A.

## B. Subsequent developments

The INS published a proposed rule in 1998, stating that the "substantive terms of the settlement form the basis for the proposed rule." 63 Fed. Reg. 39,759, 39,759 (1998). In January 2002, shortly after the Agreement was extended, the INS announced it was "reopening the comment period" and particularly sought "comments that relate to issues that have come to the public's attention since the close of the original comment period in 1998." 67 Fed. Reg. 1670, 1670 (2002). That rulemaking process did not result in a final rule.

In 2002, Congress passed the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, which abolished INS and transferred most immigration functions to the newly formed DHS, which houses Immigration and Customs Enforcement ("ICE"). 6 U.S.C. §§ 111, 251, 291. But the Act assigned responsibility for the care of "unaccompanied alien children who are in Federal custody by reason of their immigration status" to the Office of Refugee Resettlement ("ORR"), housed within HHS. *Id.* § 279(a), (b)(1)(A).

In 2008, Congress elaborated on ORR's duties relating to the care and custody of unaccompanied children in the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232). The

TVPRA "partially codified the [*Flores* Agreement] by creating statutory standards for the treatment of unaccompanied minors." *Flores I*, 828 F.3d at 904.

## C. *Flores I & II*

Before September 11, 2001, "families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed separately, splitting up parents and children." *Id.* at 903 (internal quotation marks omitted). After 2001, immigration policy changed, "with more restrictive immigration controls, tougher enforcement, and broader expedited removal of [inadmissible] aliens, which made the automatic release of families problematic." *Id.* (internal quotation marks omitted). Nonetheless, until 2014, ICE "generally releas[ed] parents who were not flight or safety risks." *Id.* at 908.

In 2014, ICE responded to a surge of migrating families from Central America by opening new family detention centers in Texas, which it operated under internal standards that did not comply with the Agreement. *Id.* at 904. (ICE also operated a state-licensed family detention center in Pennsylvania. *Id.* at 903.) Plaintiffs moved to enforce the Agreement, arguing both that ICE was violating its terms by holding minors in secure, unlicensed facilities, and that the Agreement required ICE to release a minor's accompanying parent, absent a flight or safety risk. *Id.* at 905. The government responded that the Agreement did not apply to accompanied minors, *id.*, and that even if it did, the Agreement should be modified to exclude them from coverage, given "the surge in family units" crossing the southwest border and the passage of the Homeland Security Act and the TVPRA, *id.* at 909–10.

*Flores I* held that the plain language of the Agreement covers accompanied minors but that the Agreement does not require the government to release parents. *Id.* at 905, 908. Importantly, the Agreement's applicability to accompanied minors does not mean that detained parents and their children must be separated. If the government does not release parents, the parents have a choice, albeit a difficult one: they may choose to exercise their children's right to release under the Agreement, provided a suitable sponsor is available, or they may waive their children's rights and keep their children with them.

*Flores I* also rejected the government's motion to modify the Agreement. *Id.* at 909–10. We held that the government had not shown that the surge in family migration was unanticipated, and even if it was, modifying the Agreement to exempt accompanied minors was not a "'suitably tailored' response." *Id.* at 910 (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992)). We also held that the Homeland Security Act and the TVPRA did not make application of the Agreement to accompanied minors "impermissible." *Id.*

A year later, we held that nothing in the Homeland Security Act or the TVPRA excused the government from providing detained, unaccompanied minors with bond hearings as required by the Agreement. *Flores II*, 862 F.3d at 881. We observed that "[t]he bond hearing under Paragraph 24A is a fundamental protection guaranteed to unaccompanied minors under the *Flores* Settlement" and that it "provide[s] minors with meaningful rights and practical benefits." *Id.* at 867.

## D.  The Final Rule

In August 2019, DHS and HHS jointly issued a final rule entitled "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children." 84 Fed. Reg. 44,392 (Aug. 23, 2019) ("Final Rule"). According to the rule's preamble, the agencies' intention was to implement the *Flores* Agreement "in a manner that is workable in light of subsequent statutory, factual, and operational changes." *Id.* at 44,392. The Final Rule comprises two sets of regulations: one issued by DHS and the other by HHS. The DHS regulations address the apprehension and processing of both unaccompanied and accompanied minors, as well as the care and custody of accompanied minors. *See id.* at 44,525–30 (codified at 8 C.F.R. §§ 212.5, 236.3). The HHS regulations address only the care and custody of unaccompanied minors. *See id.* at 44,530–35 (codified at 45 C.F.R. pt. 410). The DHS regulations provide that after DHS apprehends unaccompanied minors, it ordinarily transfers them to the custody of HHS.[2] *Id.* at 44,526 (codified at 8 C.F.R. § 236.3(f)).

While the HHS regulations generally track the Agreement with respect to the treatment of unaccompanied minors, the DHS regulations applicable to the care and custody of accompanied minors, by design, depart significantly from the Agreement. The Final Rule explains at the outset that the Agreement's "application to accompanied minors has created a series of operational difficulties for DHS, most notably with respect to a state-

---

[2] Under the TVPRA, children from contiguous countries may in some circumstances be returned to those countries instead of being transferred to the custody of HHS. *See* 8 U.S.C. § 1232(a)(2).

licensing requirement for an ICE Family Residential Center . . . in which such parents/legal guardians may be housed together with their children during immigration proceedings." 84 Fed. Reg. at 44,393. Although the Agreement requires that minors who are not released must be transferred to a state-licensed program unless one of the limited criteria permitting secure detention is satisfied, *see supra* p. 14–15, only two states license facilities in which adults and children are housed together, *see* 84 Fed. Reg. at 44,394, 44,419. The DHS regulations both limit the circumstances under which accompanied minors may be released and "create[] an alternative to the existing licensed program requirement for ICE family residential centers," allowing ICE to operate family detention centers under internal standards, without state oversight. *Id.* at 44,392; *see id.* at 44,394.

## E.  The district court's order

After the government initially proposed the regulations in 2018 and before they were final, Plaintiffs filed a motion to enforce the Agreement, arguing that the proposed regulations amounted to an anticipatory breach and seeking to enjoin the government from implementing them. The district court deferred consideration of Plaintiffs' motion until the regulations became final. After the government issued its Final Rule, it filed a notice of termination of the Agreement—asserting that the Agreement expired by its own terms following publication of the Final Rule—and a motion in the alternative to terminate the Agreement under Rule 60(b) of the Federal Rules of Civil Procedure.

In September 2019, about a month before the Final Rule was to take effect, the district court granted Plaintiffs' motion to enforce and denied the government's motion to terminate. The district court concluded that the Final Rule

did not terminate the Agreement because it was inconsistent with the Agreement and therefore did not "implement[]" it as required by paragraph 40's termination clause. The district court also declined to terminate the Agreement under Rule 60(b) because, it held, the government had not demonstrated that changed circumstances warranted termination. In granting relief to Plaintiffs, the district court reasoned that the Agreement by its own terms precluded implementation of the Final Rule, as the Agreement provided that the regulations "shall not be inconsistent" with it. Agreement ¶ 9. The district court entered a permanent injunction enjoining enforcement of the Final Rule in its entirety, denying the government's request to "sever the new regulations into valid and invalid portions."

## II.

The district court's interpretation of the Agreement is reviewed *de novo*. *Flores I*, 828 F.3d at 905. Decisions on "[m]otions for relief from judgment under Rule 60(b) are reviewed for abuse of discretion." *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005).

## A.  The HHS regulations

We begin with the HHS regulations applicable to unaccompanied minors. The regulations largely parallel the Agreement with respect to unaccompanied minors' placement and care. For example, both the regulations and the Agreement direct the release of minors "without unnecessary delay," unless continued custody is necessary to ensure the minor's safety or the safety of others or to secure the minor's timely appearance before DHS or the immigration courts. *Compare* 84 Fed. Reg. at 44,532 (codified at 45 C.F.R. § 410.301(a)), *with* Agreement ¶ 14. Both provide the same ranked list of potential custodians to

whom a minor may be released, including a parent; legal guardian; other adult relative; an adult or entity designated by a parent or legal guardian; a licensed program willing to accept legal custody; or, in the absence of a likely alternative to long-term custody, another adult or entity seeking custody. *Compare* 84 Fed. Reg. at 44,532–33 (codified at 45 C.F.R. § 410.301(b)), *with* Agreement ¶ 14. And both direct that minors who remain in the government's custody—either because they present a safety or flight risk, or because a suitable custodian has not yet been found— must ordinarily be placed promptly in a "licensed program." *Compare* 84 Fed. Reg. at 44,531, 44,533 (codified at 45 C.F.R. §§ 410.202, .302), *with* Agreement ¶¶ 12.A, 19. The regulations and the Agreement provide the same definition of and standards for licensed programs. *Compare* 84 Fed. Reg. at 44,530, 44,533–34 (codified at 45 C.F.R. §§ 410.101, .402), *with* Agreement ¶ 6 & Ex. 1.

Despite the evident consistency between the Agreement and several provisions of the HHS regulations, the district court enjoined the regulations in their entirety. The district court found fault with three aspects of the HHS regulations: (1) their replacement of the Agreement's mandatory language with purportedly nonmandatory language; (2) their provisions for placing a minor in a secure facility; and (3) their provisions for bond hearings. We address each issue in turn.

### 1. Mandatory language

The district court held that the HHS regulations were inconsistent with the Agreement because the regulations use descriptive, not mandatory, language. For example, while the Agreement requires that minors not released "*shall be placed* temporarily in a licensed program" whose homes and facilities "*shall* be non-secure as required under state law,"

Agreement ¶¶ 6, 19 (emphasis added), the regulations state that "ORR *places* [unaccompanied minors] into a licensed program" and that "ORR *places* each [minor] in the least restrictive setting that is in the best interest of the child and appropriate to the [minor's] age and special needs," 84 Fed. Reg. at 44,531 (codified at 45 C.F.R. §§ 410.201(a), 410.202) (emphasis added). The government asserts on appeal that "the use of the present tense in this and other provisions does not render these provisions optional; they are mandatory." We will hold the government to its word. HHS and ORR are bound by and must comply with the descriptive language in the HHS regulations as equivalent to the mandatory requirements in the Agreement. So interpreted, the descriptive language in the regulations is consistent with the Agreement.

### 2. Placement in a secure facility

The Agreement provides that a minor may be held in a secure facility, such as a state or county juvenile detention facility, in five circumstances. Agreement ¶ 21. To summarize (although the actual circumstances are somewhat more extensive), the government may opt for secure placement whenever it determines that a minor (1) has been charged with a crime or is the subject of delinquency proceedings; (2) has committed or threatened to commit violence while in government custody; (3) has engaged in "unacceptably disruptive" conduct, such as drug or alcohol abuse, while in a licensed program; (4) is an escape-risk; or (5) must be held in a secure facility for the minor's own safety, such as when the government has reason to believe a particular minor may be abducted by a smuggler. *See id.*

In the TVPRA, Congress directed that an unaccompanied minor "shall not be placed in a secure facility absent a determination that the child poses a danger

to self or others or has been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A). The HHS regulations incorporate this statutory standard. *See* 84 Fed. Reg. at 44,531–32 (codified at 45 C.F.R. § 410.203). Like the Agreement, the regulations allow placement in a secure facility in five circumstances, the first three of which are nearly identical to the first three circumstances listed in the Agreement. The regulations add to the first and third circumstances a required finding that the minor "poses a danger to self or others." *Id.* (codified at 45 C.F.R. § 410.203(a)(1), (3)). Neither the district court nor Plaintiffs take issue with this addition.

The HHS regulations dispense with the fourth and fifth circumstances in the Agreement that permit placement in secure facilities. In their place, the regulations substitute two additional circumstances in which a minor may be placed in a secure facility: "(4) For purposes of placement in a secure residential treatment center[] . . . , if a licensed psychologist or psychiatrist determines that the [minor] poses a risk of harm to self or others; or (5) [if the minor] [i]s otherwise a danger to self or others." *Id.* at 44,532 (codified at 45 C.F.R. § 410.203(a)(4), (5)). The fourth circumstance is consistent with the district court's interpretation of the Agreement in a 2018 order, and again, neither the district court nor Plaintiffs challenge it. *See Flores v. Sessions*, No. CV 85-4544, 2018 WL 10162328, at *10–11 (C.D. Cal. July 30, 2018).

The district court held that the fifth circumstance— which allows placement of a minor in a secure facility upon an agency determination that the minor is "otherwise a danger to self or others"—is a "significant deviation" from the Agreement. The government insists that "this standard comes directly from the TVPRA" and "implements Paragraph 21" of the Agreement. Additionally, the

government points to the assurance, later in the same section of the HHS regulations, that "[n]otwithstanding ORR's ability . . . to place [unaccompanied minors] who are 'otherwise a danger to self or others' in secure placements, the provision in this section does not abrogate any requirements to place [unaccompanied minors] in the least restrictive setting appropriate to their age and special needs." 84 Fed. Reg. at 44,532 (codified at 45 C.F.R. § 410.203(d)).

We agree with the district court that nothing in the TVPRA requires the fifth, catchall circumstance in the HHS regulations and that the catchall provision is inconsistent with the Agreement. The TVPRA states that a minor shall not be placed in a secure facility "*absent* a determination that the child poses a danger to self or others," 8 U.S.C. § 1232(c)(2)(A) (emphasis added), not that ORR may place a minor in a secure facility whenever it makes that determination. As the district court explained, the government in the Agreement committed to limit the circumstances under which secure detention would be permitted to those specifically enumerated in paragraph 21 of the Agreement. By adding a catchall provision, the HHS regulations broaden the circumstances in which a minor may be placed in a secure facility and are therefore inconsistent with the Agreement.

The government's assurance that it will comply with its obligation to place minors in the least restrictive setting appropriate does not affect that conclusion, as it would not prevent the government from relying on the catchall provision as a ground for the determination that a child's least restrictive setting is a secure facility. Nor is the inconsistency between the regulations and the Agreement required by the TVPRA, as the government can comply with both the TVPRA and the Agreement by abiding by the

Agreement's limitations. *See Flores II*, 862 F.3d at 874. We therefore conclude that the catchall provision, 45 C.F.R. § 410.203(a)(5), is inconsistent with the Agreement and may not take effect.

### 3. Bond hearings

The Agreement provides that a "minor in deportation proceedings" who is kept in government custody "shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."[3] Agreement ¶ 24A. "The bond hearing under Paragraph 24A is a fundamental protection guaranteed to unaccompanied minors under the *Flores* Settlement." *Flores II*, 862 F.3d at 867. That is so even though "a favorable finding in a hearing under Paragraph 24A does not entitle minors to release." *Id.* Release is not guaranteed upon a finding by the immigration judge "that the form of detention ORR has imposed is improper" because "the government must still identify a safe and secure placement into which the child can be released." *Id.* Nonetheless, a bond hearing "does provide minors with meaningful rights and practical benefits." *Id.* Without one, minors "have no meaningful forum in which to challenge ORR's decisions regarding their detention or even to

---

**[3]** "Administrative removal proceedings to determine a non-citizen's right to remain in the United States [are] re-designated as 'removal' rather than 'deportation' under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996)." *Flores II*, 862 F.3d at 869 n.5. We "therefore treat[] 'deportation proceedings' as addressed in the [Agreement] to be the equivalent of the 'removal proceedings' that take place under the current statutory framework." *Id.*

discover why those decisions have been made." *Id.* at 867–68.

Like the Agreement, the HHS regulations provide unaccompanied minors held in government custody with an opportunity for a bond hearing, but the hearing is before an HHS adjudicator instead of an immigration judge. *See* 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810). Under the regulations, an unaccompanied minor "may *request* that an independent hearing officer employed by HHS determine . . . whether the [minor] would present a risk of danger to the community or risk of flight if released." *Id.* (codified at 45 C.F.R. § 410.810(a)) (emphasis added). The preamble to the Final Rule explains that the regulations are intended to "afford the same type of hearing paragraph 24(A) calls for, while recognizing the transfer of responsibility of care and custody of [unaccompanied minors] from the former INS to HHS ORR. . . . The idea was to provide essentially the same substantive protections as immigration court custody hearings, but through a neutral adjudicator at HHS rather than DOJ." *Id.* at 44,476.

The district court rejected the HHS hearing regulations as inconsistent with the Agreement. The court reasoned that the regulations depart from the Agreement by (1) shifting bond redetermination hearings "away from independent immigration judges" and (2) transforming the hearings "into an opt-in rather than opt-out right." The district court concluded that these differences "would effectively abrogate" the Agreement's guarantee of a bond hearing. We disagree with the district court as to the first inconsistency it perceived and agree, in part, as to the second.

The regulations' provision for a hearing before "an independent hearing officer employed by HHS," rather than an immigration judge, is not a material departure from the

Agreement. 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)). When the Agreement was signed, it applied to minors "detained in the legal custody of the INS." Agreement ¶ 10. The INS, like the Executive Office for Immigration Review—the agency employing immigration judges—was housed in the Department of Justice. *See* 84 Fed. Reg. at 44,479. As a consequence of Congress's assigning responsibility for unaccompanied minors to HHS in the Homeland Security Act and the TVPRA, HHS is the INS's successor agency for purposes of the Agreement's provisions relating to the care and custody of unaccompanied minors. That reassignment of responsibility attenuated the connection between immigration judges and the government's custody determinations for those minors. Shifting bond redetermination hearings for unaccompanied minors from immigration judges, adjudicators employed by the Justice Department, to independent adjudicators employed by HHS is a permissible interpretation of the Agreement, so long as the shift does not diminish the due process rights the Agreement guarantees.

We conclude it does not. *Flores II* identified the critical due process rights afforded by a bond hearing under the Agreement: (a) the "right to be represented by counsel"; (b) the "right to make an oral statement"; (c) the right to "examine and rebut the government's evidence"; (d) the right to "create an evidentiary record"; (e) the right "to have the merits of [the minor's] detention assessed by an independent" adjudicator; and (f) the right to appeal the adjudicator's decision. 862 F.3d at 867–68, 879. The government asserts that the HHS regulations guarantee the very protections identified in *Flores II*. *See* 84 Fed. Reg. at 44,478. Consistent with the government's commitment, we interpret the regulations as requiring the government to provide these protections. *See id.* at 44,535 (codified at

45 C.F.R. § 410.810(c) (right to representation by counsel; right to present oral and written evidence), (b) (requiring HHS to present evidence "support[ing] its determination" that a minor "would pose a danger or flight risk if discharged" and allowing the minor an opportunity to "show that he or she will not be a danger to the community or flight risk if released"), (a) (right to a "written decision" by an "independent hearing officer"), (e) (right to appeal the hearing officer's decision to the Assistant Secretary of the Administration for Children and Families)).

The right we recognized in *Flores II* to an independent assessment of custody determinations was not the right to have those determinations reviewed by an immigration judge in particular, but the right to have such determinations reviewed by an adjudicator "independent" from the entity making the determinations. 862 F.3d at 867. The regulations guarantee a hearing before an "independent" hearing officer. 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)); *see id.* at 44,479. Neither Plaintiffs nor the district court explains why independent hearing officers employed by HHS would not be as competent to make custody determinations as immigration judges, who are employed by the Justice Department and are subject to supervision by the Attorney General.[4] As explained in the preamble to the Final Rule, the government anticipates that the independent

---

[4] *See, e.g.*, Memorandum from the U.S. Attorney General to the Executive Office for Immigration Review, Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest (Dec. 5, 2017), available at https://www.justice.gov/eoir/file/1041196/download; Memorandum from Director, Executive Office for Immigration Review, to the Office of the Chief Immigration Judge et al., Case Priorities and Immigration Court Performance Measures (Jan. 17, 2018), available at https://www.justice.gov/eoir/page/file/1026721/download.

hearing office established by HHS to conduct hearings under the regulations will "accrue specialized expertise and at least in theory be able to make adjudications more quickly and effectively than immigration judges who remain largely unfamiliar with ORR policies and practices." *Id.* at 44,483. We conclude that the regulations' provision for a hearing before an "independent hearing officer employed by HHS" is consistent with the Agreement.

We agree with the district court, however, that the distinction between the Agreement's opt-out process for obtaining a bond hearing and the regulations' opt-in process is significant for some unaccompanied minors. The text of the Agreement provides unambiguously for a bond hearing "unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." Agreement ¶ 24.A. Under the regulations, in contrast, a minor, the minor's legal representative, or the minor's parent or legal guardian "may request" a hearing. 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)).

The government maintains that the difference is immaterial in practice. The preamble to the Final Rule explains that HHS has not automatically instituted a bond redetermination hearing for every unaccompanied minor in custody who does not affirmatively refuse one. *Id.* at 44,478. Instead, the agency gives every such minor "the opportunity to request a bond hearing." *Id.* Most unaccompanied minors in ORR custody are placed in shelters or group homes because ORR has determined that these minors do not present a safety or flight risk. *See id.* at 44,477. These minors remain in custody only because a suitable custodian has not yet been found. *See id.* at 44,533 (codified at 45 C.F.R. § 410.302(a)). Unaccompanied minors in these placements are entitled to request a bond hearing, *see id.* at 44,480, but

if they do, ORR typically stipulates that "it does not consider the children to be dangerous or flight risks," *id.* at 44,477, 44,480. As to these minors, we agree that the distinction between an opt-out and an opt-in right to a hearing is immaterial. The stipulations fulfill the purpose of the bond hearings for these minors, as the bond hearings do not decide anything beyond whether the minors present a safety or flight risk. *See supra* pp. 25–26. Automatically holding bond hearings, notwithstanding the stipulations, would be pointless.

The situation is different for unaccompanied minors placed in secure or staff-secure facilities, however.[5] The regulations provide that unaccompanied minors "placed in secure or staff secure facilities" will receive notice of their right to request a bond hearing and may use a form provided to them to request one.[6] 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)(2)). All minors in ORR custody must also be provided with a list of free legal services providers. *Id.* (codified at 45 C.F.R. § 410.801(b)(1)). Additionally, the regulations permit a minor's legal representative, parent, or legal guardian to request a hearing. *Id.* (codified at 45 C.F.R. § 410.810(a)(1)).

The government represents that these provisions "mirror[] current practice." 84 Fed. Reg. at 44,478. As to unaccompanied minors held in secure or staff-secure

---

[5] If a minor presents a flight risk, ORR may place the minor in a "staff secure" facility, which is a licensed program with "stricter security measures, such as intensive staff supervision . . . to control problem behavior and to prevent escape." 84 Fed. Reg. at 44,531 (codified at 45 C.F.R. § 410.101).

[6] "For purposes of 810 hearings, HHS plans to treat [residential treatment centers] as secure facilities." 84 Fed. Reg. at 44,480.

placements, however, for whom the bond hearing is a "fundamental protection," *Flores II*, 862 F.3d at 867, current practice does not supersede the plain language of the Agreement. The opt-out process is a "meaningful" procedural right for these minors. *Flores II*, 862 F.3d at 867. The government has apparently disregarded that right in practice, but it does not follow that we can sanction that disregard.

We conclude that the HHS hearing regulations are consistent with the Agreement except to the extent that they require unaccompanied minors held in secure or staff-secure placements to request a hearing, rather than providing a hearing to those minors automatically unless they refuse one.

\*     \*     \*

In sum, the HHS regulations are largely consistent with the Agreement, with the exceptions we have detailed. The district court erred in enjoining the HHS regulations in their entirety, as there is no legal justification for enjoining the consistent regulations. The Agreement forbids only "inconsistent" regulations, Agreement ¶ 9, and the Final Rule provides that the regulations are severable: "To the extent that any portion of this final rule is declared invalid by a court, the Departments intend for all other parts of the final rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect," 84 Fed. Reg. at 44,408; *see MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

The HHS regulations may therefore take effect, with two exceptions. First, the broad provision allowing ORR to place an unaccompanied minor in a secure facility if the minor is "otherwise a danger to self or others," 45 C.F.R.

§ 410.203(a)(5), is inconsistent with the Agreement and may not take effect. Second, the portion of the hearing regulations providing a hearing to unaccompanied minors held in secure or staff-secure placements only if they request one, *see id.* § 410.810(a), may not take effect. As to these minors, HHS must implement paragraph 24.A of the Agreement as written and provide a hearing unless one is refused.[7]

Although we hold that the majority of the HHS regulations may take effect, we also hold that the district court did not abuse its discretion in declining to terminate those portions of the Agreement covered by the HHS regulations. The government moved the district court to terminate the Agreement in full, not to modify it or terminate it in part. The Agreement therefore remains in effect, notwithstanding the overlapping HHS regulations. If the government wishes to move to terminate those portions of the Agreement covered by the valid portions of the HHS regulations, it may do so.

## B. The DHS regulations

### 1. Initial apprehension and processing of both unaccompanied and accompanied minors

As noted above, the DHS regulations address the apprehension and processing of both unaccompanied and accompanied minors, as well as the care and custody of accompanied minors. *See* 84 Fed. Reg. at 44,525–30 (codified at 8 C.F.R. §§ 212.5, 236.3). The government

---

[7] To be clear, we do not invalidate 45 C.F.R. § 410.810(a) to the extent that it provides unaccompanied minors with the right to have "an independent hearing officer employed by HHS determine, through a written decision, whether the [minor] would present a risk of danger to the community or risk of flight if released."

contends that some of the provisions relating to the initial apprehension and processing of minors mirror the Agreement and should be allowed to take effect. Specifically, the government points to 8 C.F.R. § 236.3(f), regarding the transfer of unaccompanied minors from DHS to HHS, and 8 C.F.R. § 236.3(g)(2), regarding DHS custodial care immediately following apprehension. We agree that these provisions are consistent with the Agreement and may take effect. *Compare* 84 Fed. Reg. at 44,526–27 (codified at 8 C.F.R. § 236.3(f), (g)(2)), *with* Agreement ¶¶ 11, 12A, 25.

### 2.  Care and custody of accompanied minors

The DHS regulations relating to the care and placement of accompanied minors differ substantially from the Agreement in two principal, related ways: (1) they limit the circumstances in which accompanied minors may be released, and (2) they provide for the detention of families together in facilities licensed not by states but by ICE itself. These departures undermine the Agreement's core "presumption in favor of releasing minors," and its requirement that those not released be placed in "licensed, non-secure facilities that meet certain standards." *Flores I*, 828 F.3d at 901.

Acknowledging that the DHS regulations are inconsistent with the Agreement as we have interpreted it, the government maintains that circumstances have changed, and "applying [the Agreement] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The government asserts

that the district court therefore abused its discretion in declining to terminate the Agreement.**[8]**

We first describe the inconsistencies between the DHS regulations and the Agreement, and then address the government's changed circumstances arguments

### a.  Release of accompanied minors

Paragraphs 14 and 18 of the Agreement require the prompt release of minors from government custody. The Agreement provides that unless detention is "required either to secure [a minor's] timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay" to a ranked list of six potential custodians, including family members and other designated adults or entities. Agreement ¶ 14. If a minor is not released, the INS "shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor pursuant to Paragraph 14," and those efforts "shall continue so long as the minor is in INS custody." Agreement ¶ 18.

Although DHS's new regulations also state that "DHS will make and record prompt and continuous efforts on its part toward the release of [a] minor who is not [an unaccompanied minor]," 84 Fed. Reg. at 44,529 (codified at 8 C.F.R. § 236.3(j)(1)), several provisions of the regulations

---

**[8]** The government argues in the alternative that the Agreement terminated by its own terms because the regulations are consistent with the Agreement "except for a few minor differences." Because we conclude that the differences are substantial and affect the central protections afforded by the Agreement, we reject the government's argument that the Agreement terminated by its own terms.

work together to reduce the circumstances in which accompanied minors are released.

First, the regulations provide for mandatory detention of accompanied minors in expedited removal proceedings, unless release is "required to meet a medical emergency or . . . necessary for a legitimate law enforcement objective." *See id.* at 44,525, 44,529 (codified at 8 C.F.R. §§ 212.5, 236.3(j)(2)) (applying parole standard in 8 C.F.R. §§ 235.3(b)(2)(ii), (b)(4)(ii)). Under the Immigration and Nationality Act ("the Act"), DHS is authorized to expedite the removal of certain inadmissible individuals "without further hearing or review unless" they indicate "either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). The government maintains that DHS's new parole standard for accompanied minors in expedited removal proceedings is "consistent with" the Act, which provides generally that individuals in such proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV).

As we have recognized, however, the Act's "expedited removal [process] does *not* require mandatory detention for minors." *Flores v. Barr*, 934 F.3d 910, 917 (9th Cir. 2019). "[E]ven for noncitizens in expedited removal, 'the Attorney General may . . . in his discretion parole into the United States temporarily' any noncitizen applying for admission 'under such conditions as he may prescribe.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). We therefore upheld as consistent with the Act, and with DHS's prior regulations implementing the Act, the district court's previous conclusion that the Agreement "requires the government to consider releasing [minors] subject to expedited removal." *Id.* at 916. Specifically, the district court held that the

"Agreement creates an affirmative obligation on the part of [DHS] to individually assess each [minor's] release . . . in cases involving minors in expedited removal." *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1066 (C.D. Cal. 2017). That individualized assessment should consider, for example, whether the minor presents a flight risk and whether a suitable custodian is available. *See id.* at 1065–68. By making parole categorically unavailable to accompanied minors in expedited removal proceedings, except in the case of a medical emergency or a law enforcement request, the new parole standard undermines the Agreement's release mandate.

Second, in keeping with the decision not to make parole available to accompanied minors in expedited removal proceedings, the DHS regulations also deny bond hearings to these same minors. 84 Fed. Reg. at 44,529 (codified at 8 C.F.R. § 236.3(m)); *see id.* at 44,394–95. As discussed above, the right to have an independent adjudicator review the government's custody determinations is "a fundamental protection" afforded by the Agreement. *Flores II*, 862 F.3d at 867. Although *Flores II* addressed only unaccompanied minors, as the government in that case did "not contest that accompanied minors remain entitled to bond hearings," *id.* at 881 n.20, the Agreement provides that minors are entitled to "a bond redetermination hearing . . . in *every* case," Agreement ¶ 24.A (emphasis added). The DHS regulations' denial of bond hearings to accompanied minors in expedited removal proceedings is inconsistent with the Agreement.

Finally, for accompanied minors in standard removal proceedings, the new DHS regulations shrink the pool of potential custodians to whom DHS is required to release a minor who does not present a safety or flight risk. As noted above, the Agreement requires release to one of a ranked list

of six possible custodians, including (1) a parent; (2) a legal guardian; (3) another adult relative; (4) an adult or entity designated by a parent or legal guardian; (5) a licensed program willing to accept legal custody; or, (6) in the absence of a likely alternative to long-term custody, another adult or entity seeking custody. Agreement ¶ 14. The DHS regulations, in contrast, require release only to a parent or a legal guardian. 84 Fed. Reg. at 44,529 (codified at 8 C.F.R. § 236.3(j)(5)(i)). Release to another adult relative is not "preclude[d]" by the regulations but would occur only in the "unreviewable discretion of DHS." *Id.* The remaining three options for possible custodians listed in the Agreement do not appear at all in the regulations. As a result, if an entire family is in detention and DHS declines to release an adult relative, then release of an accompanied minor is not an option, in stark contrast to the Agreement's release mandate.

### b. Licensed facilities

The Agreement mandates that a minor who is not released "shall be placed temporarily in a licensed program until such time as release can be effected . . . or until the minor's immigration proceedings are concluded, whichever occurs earlier." Agreement ¶ 19. A "licensed program" is one "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," and its facilities "shall be non-secure as required under state law." *Id.* ¶ 6.

In contrast, the DHS regulations define a licensed facility as "an ICE detention facility that is licensed by the state, county, or municipality in which it is located, if such a licensing process exists." 84 Fed. Reg. at 44,526 (codified at 8 C.F.R. § 236.3(b)(9)). But if a "licensing process for the detention of minors accompanied by a parent or legal guardian is not available . . . , DHS shall employ an entity

outside of DHS that has relevant audit experience to ensure compliance with the family residential standards established by ICE." *Id.* The minimum standards set forth in the regulations match the standards for licensed programs prescribed by the Agreement. *Compare id.* at 44,528–29 (codified at 8 C.F.R. § 236.3(*i*)(4)), *with* Agreement ¶ 6 & Ex. 1.

"[M]ost States do not offer a licensing program for family unit detention"; currently, only Texas and Pennsylvania do. 84 Fed. Reg. at 44,394, 44,419. The regulations' revised definition of "licensed facility" thus greatly expands DHS's ability to detain minors with their accompanying adults.

Notably, the regulations expressly define a licensed facility as a "detention facility," as opposed to the group homes contemplated by the Agreement. *Compare id.* at 44,526 (codified at 8 C.F.R. § 236.3(b)(9)), *with* Agreement ¶ 6. The HHS regulations applicable to unaccompanied minors highlight the DHS regulations' departure from the Agreement; the former explain that a licensed program is "usually . . . an open setting, such as a foster or group home, and not [a] detention facilit[y]." 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.801(b)(2)).

In keeping with the DHS regulations' conception of a licensed facility as a detention facility, the regulations offer the following definition of "non-secure," in the event that state law does not define that term: "a DHS facility shall be deemed non-secure if egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building." *Id.* at 44,526 (codified at 8 C.F.R.

§ 236.3(b)(11)). As Plaintiffs point out, this definition is broad enough to cover a facility that prohibits egress from its detention area through internal locks but has an unlocked reception area on the public side of a sally gate. Although the district court previously found that ICE's family residential center in Karnes, Texas, is a secure facility, *see Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015), the government "maintains that its [family residential centers] have been and continue to be non-secure," 84 Fed. Reg. at 44,443.[9]

We might conclude that the regulations regarding licensed facilities were consistent with the Agreement if they simply allowed for the licensing of shelters or group homes, similar to those contemplated by the Agreement, that permitted the placement of parents and children together. But that is not what the regulations do. The government's intent is not to place families together in "an open setting," *id.* at 44,535 (codified at 45 C.F.R. § 410.801(b)(2)), but to "detain" them together for "enforcement" purposes, *id.* at 44,398, as discussed further below. We therefore conclude that the new regulations regarding licensed facilities are inconsistent with the Agreement.

### c. Changed circumstances

Together, the DHS regulations regarding the release of accompanied minors and the revised definition of "licensed facility" dramatically increase the likelihood that accompanied minors will remain in government detention indefinitely, instead of being released while their immigration proceedings are pending or housed in

---

[9] DHS has committed to adding "additional points of egress" to the Karnes facility. *Id.*

nonsecure, licensed facilities. Effecting this change was one of the principal features of the Final Rule. The government "strongly disagrees" with our holding in *Flores I* that "the plain language of the Agreement clearly encompasses accompanied minors," 828 F.3d at 905 (cleaned up); 84 Fed. Reg. at 44,393, and "maintains that the terms of the [Agreement] were intended to apply only to those alien children in custody who are unaccompanied," 84 Fed. Reg at 44,402. The preamble to the Final Rule explains that "by modifying the literal text of the [Agreement] (to the extent it has been interpreted to apply to accompanied minors) . . . to reflect and respond to intervening statutory and operational changes, DHS ensures that it retains discretion to detain families . . . to meet its enforcement needs." *Id.* at 44,398.

The government contends that the legal and factual changes that guided its development of the Final Rule also justify termination of the Agreement under Rule 60(b)(5).**[10]** When the government seeks to modify or terminate a consent decree based on changed circumstances, it "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citation omitted) (quoting *Agostini v. Felton*, 521 U.S. 203,

---

**[10]** We have already addressed the government's request to terminate the Agreement with respect to unaccompanied minors. *See supra* p. 32. Here we address the government's request to terminate the Agreement based on changes relating to accompanied minors.

215 (1997)). *Rufo*'s standard is "flexible" because consent decrees in "institutional reform litigation . . . reach beyond the parties involved directly in the suit" and affect the "public's right to the sound and efficient operation of its institutions." 502 U.S. at 381 (cleaned up).

The government asserts that four changes justify termination of the Agreement: (1) legislative changes, (2) the Final Rule itself, (3) major shifts in migration patterns, and (4) flaws in the certified class. We address each in turn.

### i.   Legislative changes

The government contends that the Homeland Security Act and the TVPRA significantly changed the legal landscape, warranting termination of the Agreement. A change in law may justify modifying or terminating a consent decree if the new law makes complying with the consent decree "impermissible," or, on the other hand, if it "make[s] legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 388.

The government maintains that by codifying the Agreement's protections for unaccompanied minors, Congress signaled it was leaving the treatment of accompanied minors to DHS's discretion. But we have already held to the contrary. *Flores I* determined that the "creation of statutory rights for *unaccompanied* minors does not make application of the [Agreement] to *accompanied* minors 'impermissible.'" 828 F.3d at 910. As the government does not otherwise argue that the statutes "make legal what the decree was designed to prevent," *Rufo*, 502 U.S. at 388, it has not demonstrated that the Homeland Security Act and the TVPRA effected legal changes warranting termination of the Agreement.

### ii. The Final Rule

The government contends that the Final Rule is a "fundamental change in law implementing the [Act] as well as the goals of the Agreement," justifying termination of the Agreement under Rule 60(b). We reject the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree. *See Nehmer v. U.S. Dep't of Veterans Aff.*, 494 F.3d 846, 860 (9th Cir. 2007) (rejecting an agency's attempt to avoid complying with a consent decree by issuing a regulation reinterpreting the decree). Although the Agreement itself contemplates termination upon the promulgation of *consistent* regulations, it certainly does not follow that the executive branch retained the power to bring about termination through the promulgation of *inconsistent* regulations. The Final Rule is not a significant change warranting termination of the Agreement.

### iii. Shifts in migration patterns

The crux of the government's changed circumstances argument is that an unprecedented increase in the number of minors arriving annually at U.S. borders warrants termination of the Agreement. According to the government, "irregular family migration" has increased by 33 times since 2013, and in 2019, more than 500,000 people traveling as families reached the southwest border. A change in facts may warrant modification of a consent decree "when changed factual conditions make compliance with the decree substantially more onerous," the "decree proves to be unworkable because of unforeseen obstacles," or "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.

The government contends that the increase in family migration, combined with the requirements of the Agreement, has created practical problems for DHS. The Final Rule explains that when DHS encounters a removable adult traveling with his or her removable child, the government has

> three primary options for purposes of immigration custody: (1) Release all family members into the United States; (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or transfer the juvenile to HHS as [an unaccompanied minor]; or (3) detain the family unit together as a family by placing them at an appropriate [family detention center] during their immigration proceedings.

84 Fed. Reg. at 44,403. The government views the first option as problematic, both because it creates incentives for bringing children on the dangerous journey to cross the border and because many families released into the United States fail to appear for their removal proceedings. *Id.* at 44,403, 44,405. The second option, the government says, "should be avoided when possible, and has generated significant litigation." *Id.* at 44,403.

The government prefers the third option. *See id.* at 44,403. But the Agreement flatly precludes that approach. The Agreement requires DHS (1) to release rather than detain minors who do not present a safety or flight risk, as long as a suitable custodian is available, and (2) to place minors who are not released in a non-secure, state-licensed facility. As noted above, most states do not license facilities for holding families together, which has "severely limited"

the government's "ability to maintain detention of families together." *Id.* at 44,405.

Again, if the only problem were a lack of licensed facilities to hold accompanied minors who could not be released, either because they presented a safety or flight risk or because a suitable custodian was not available, then modification of the Agreement would perhaps be warranted. As the district court has observed, it may sometimes be "in the best interests of an accompanied minor to remain with a parent who is in detention." *Flores v. Sessions*, 394 F. Supp. 3d at 1067. We have recognized that the Agreement "gave inadequate attention" to the "housing of family units." *Flores I*, 828 F.3d at 906. To the extent the Agreement precludes keeping parents and children together based solely on a lack of state licensing schemes that the parties to the Agreement may not have anticipated, then an appropriate modification of the Agreement, permitting placement in non-state-licensed facilities meeting specified standards, might be justified.

But the government seeks a much more comprehensive change. The DHS regulations jettison the Agreement's release mandate for accompanied minors except in narrow circumstances. The government has not convincingly explained why the increase in families arriving at the southwest border requires DHS to detain instead of releasing accompanied minors. As we held in *Flores I*, "even if the parties did not anticipate an influx of this size, we cannot fathom how a 'suitably tailored' response to the change in circumstances would be to exempt an entire category of migrants from the [Agreement], as opposed to, say, relaxing certain requirements applicable to all migrants." 828 F.3d at 910 (quoting *Rufo*, 502 U.S. at 383). The Final Rule takes precisely the approach *Flores I* rejected: it retains the release

mandate for unaccompanied minors and largely erases it for accompanied minors.

Although the Final Rule suggests the government must detain families to ensure they appear for their immigration hearings, the record casts doubt on that contention. Public comments on the Final Rule highlighted the success of DHS's Family Case Management Program, "an alternative to detention that use[d] case managers to ensure participants compl[ied] with immigration obligations, such as check-ins with [ICE] and attendance at immigration court hearings, while allowing them to remain in their community as they move[d] through immigration proceedings." DHS Office of Inspector General, Rep. No. OIG–18–22, U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract 2 (2017), available at https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-22-Nov17.pdf (cited at 84 Fed. Reg. at 44,487 n.58). "[P]articipants in the [Family Case Management Program] had a 100 percent attendance record at court hearings and a 99 percent rate of check-ins and appointments with ICE." 84 Fed. Reg. at 44,487. The Final Rule explains that the program was discontinued in 2017 for cost reasons, while acknowledging that the program was generally less expensive than detention. *Id.* at 44,488.

Even if the government has legitimate justifications for detaining adults, it has not shown why it must also detain accompanying minors. For example, the government could detain parents but release their children to another available relative. The Final Rule suggests disingenuously that family separation "has generated significant litigation," 84 Fed. Reg. at 44,403, but the litigation it cites relates to the government's recent practice of *forcibly* separating parents and children, *see Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1154

(S.D. Cal. 2018). Nothing in the Agreement requires the government to take children from their parents against the parents' will. The Agreement provides for the release of a minor to an adult "brother, sister, aunt, uncle, or grandparent" and, if none of those relatives are available, provides a mechanism for parents to "designate" another "adult individual or entity . . . as capable and willing to care for the minor's well-being." Agreement ¶ 14C and D. Of course, parents can waive their children's right to release under the Agreement. *See supra* p. 17.

The government has failed to demonstrate that the recent increase in family migration has made complying with the Agreement's release mandate for accompanied minors "substantially more onerous," "unworkable," or "detrimental to the public interest." *Rufo*, 502 U.S. at 384.

### iv.  The certified class

Finally, the government contends there are three flaws in the certified class of Plaintiffs that constitute changed circumstances warranting termination of the Agreement: (1) the class is "too unwieldy for management in a single litigation"; (2) the class includes accompanied minors but not their parents; and (3) one of Plaintiffs' counsel has a conflict of interest because he operates a shelter for migrant youth, including minors released under the Agreement.

*Flores I* held that "the government waived its ability to challenge the class certification when it settled the case and did not timely appeal the final judgment." 828 F.3d at 908. The government contends that the standards for class certification have changed and would preclude certification of the same class today. But the government cites no authority supporting its suggestion that the evolution of Rule 23 standards warrants termination of a consent decree

concerning a previously certified class, particularly when the government has never moved to decertify or modify the class. The government has not carried its burden to establish that the supposed flaws in the certified class constitute a significant change warranting termination of the Agreement.

We are mindful of the reality that under certain circumstances, it will be appropriate to amend or terminate long-running consent decrees. *See Horne*, 557 U.S. at 447–49. But the government has not shown that the district court abused its discretion in denying termination in this instance.**[11]**

## III.

The HHS regulations, as we have interpreted them, are consistent with the Agreement and may take effect, with the exception of 45 C.F.R. § 410.203(a)(5) and § 410.810(a) to the extent it provides a bond hearing to unaccompanied minors held in secure or staff-secure placements only if they request one. Some of the DHS regulations regarding initial apprehension and detention, specifically 8 C.F.R. § 236.3(f) and (g)(2), are consistent with the Agreement and may take effect. The remaining DHS regulations are inconsistent with the Agreement, and the district court properly enjoined them and the inconsistent HHS regulations from taking effect. Additionally, the district court did not abuse its discretion in denying the government's motion to terminate the

---

**[11]** The government also argues that the district court should have terminated the Agreement because the government has "substantially complied" with it. *See Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th Cir. 2011). The significant inconsistencies between the DHS regulations and the Agreement detailed in this opinion preclude a finding of substantial compliance.

Agreement.**[12]** The judgment of the district court is therefore
**AFFIRMED in part and REVERSED in part.**

---

**[12]** As noted *supra* p. 32, the government may move to terminate those parts of the Agreement that are covered by the valid portions of the HHS regulations. Any motion to terminate the Agreement in part would have to take into account our holding in *Flores I* that the Agreement protects both unaccompanied and accompanied minors. *See* 828 F.3d at 905–08.