**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTIAN RUIZ,

      *Petitioner*,

  v.

PAMELA BONDI, Attorney
General,

      *Respondent*.

No. 23-1095

Agency No.
A027-962-997

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 4, 2024
Portland, Oregon

Filed December 22, 2025

Before: Consuelo M. Callahan, Jacqueline H. Nguyen, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Immigration

The panel denied Christian Ruiz's petition for review of the Board of Immigration Appeals' decision upholding the denial of asylum on timeliness grounds, withholding of removal and protection under the Convention Against Torture, and a motion for administrative closure.

As an initial matter, the panel addressed its jurisdiction to review the BIA's determination that Ruiz failed to establish extraordinary circumstances to qualify for an exception to the one-year asylum timeliness requirement under 8 U.S.C. § 1158(a)(2). Although the Immigration and Nationality Act strips jurisdiction to review many of the Attorney General's discretionary decisions, 8 U.S.C. § 1252(a)(2)(B), as well as decisions regarding the timeliness of asylum applications, 8 U.S.C. § 1158(a)(3), this court held in *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) (per curiam), that it could exercise jurisdiction when the issue involves "the application of a statutory standard to undisputed facts" rather than "the agency's exercise of discretion." The panel considered whether *Ramadan* remained good law in light of *Wilkinson v. Garland*, 601 U.S. 209 (2024), which analyzed whether an immigration statute calls for a reviewable application of law to fact, and concluded that to the extent *Ramadan* held that the agency's extraordinary circumstances determination was not discretionary, that determination was clearly

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

irreconcilable with *Wilkinson*. However, *Wilkinson*'s core holding—that the court retains jurisdiction to review mixed questions of law and fact under 8 U.S.C. § 1252(a)(2)(D)—permits the court to review those legal issues even when the INA makes them discretionary. Thus, the panel held that it had jurisdiction to review—with deference—the Attorney General's extraordinary circumstances determination because it presented a mixed question of law and fact.

The panel held that the BIA did not err in concluding that Ruiz failed to qualify for the extraordinary circumstances exception to the asylum timeliness bar. Although Ruiz asserted that his past experiences in Nicaragua had long-term effects on his mental health, he failed to explain how the trauma he experienced affected his ability to file a timely asylum application.

The panel held that substantial evidence supported the BIA's determination that the Department of Homeland Security rebutted the presumption of future persecution in Nicaragua based on changed country conditions since the Sandinistas harmed Ruiz and his family during the civil war in the late 1970s and early 1980s. After Ruiz and his family returned to Nicaragua in the 1990s, they did not suffer further harm, and Ruiz presented no evidence that the current government has any interest in harming him or his family members.

The panel held that the BIA did not abuse its discretion in denying Ruiz's motion for administrative closure to seek adjustment of his status to lawful permanent resident based on his marriage to a United States citizen. The Department of Homeland Security provided a persuasive reason for the case to proceed and be resolved on the merits —namely, Ruiz's criminal conduct and immigration

history. Moreover, the regulations provided Ruiz an alternative procedure for seeking an unlawful presence waiver once the order of removal became administratively final and Ruiz obtained consent to reapply for admission after removal. Thus, the BIA's conclusion that administrative closure would not affect Ruiz's immigration proceedings was not arbitrary, irrational, or contrary to the law.

## COUNSEL

Caroline K. Medeiros (argued), Marandas Garcia Law Group LLC, Lake Oswego, Oregon, for Petitioner.

Sarah K. Pergolizzi (argued) and Kohsei Ugumori, Senior Litigation Counsels; Leslie McKay, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

# OPINION

NGUYEN, Circuit Judge:

Christian Ruiz, a native and citizen of Nicaragua, applied for asylum more than a year after arriving in the United States. With limited exceptions, the Immigration and Nationality Act ("INA") bars such applications as untimely. *See* 8 U.S.C. § 1158(a)(2)(B). Invoking one such exception, Ruiz argues that his delay was due to "extraordinary circumstances." *Id.* § 1158(a)(2)(D). The immigration judge ("IJ") rejected Ruiz's argument and further found that he was not entitled to any other relief from removal. The Board of Immigration Appeals ("BIA") affirmed, and Ruiz petitions for review of that decision.

Although the INA strips our jurisdiction to review many of the Attorney General's discretionary decisions, *see id.* § 1252(a)(2)(B), as well as decisions regarding the timeliness of asylum applications, *see id.* § 1158(a)(3), we have held that we can exercise jurisdiction when the issue involves "the application of a statutory standard to undisputed facts" rather than "the agency's exercise of discretion." *Ramadan v. Gonzales*, 479 F.3d 646, 650, 654 (9th Cir. 2007) (per curiam); *see Husyev v. Mukasey*, 528 F.3d 1172, 1178–79 (9th Cir. 2008) (holding that the "extraordinary circumstances" determination "presents a question of law" when the underlying facts are undisputed). The initial question before us is whether *Ramadan* remains good law in light of *Wilkinson v. Garland*, 601 U.S. 209 (2024), which analyzed whether an immigration statute calls for a reviewable application of law to fact.

We hold that *Wilkinson* is clearly irreconcilable with *Ramadan*'s holding that the "extraordinary circumstances"

determination is not discretionary. *Wilkinson* identified statutes requiring discretionary rulings, and these statutes are structurally indistinguishable from § 1158(a)(2)(D). While the statute prohibiting review of discretionary decisions has an exception for decisions regarding "relief under [§] 1158(a)," 8 U.S.C. § 1252(a)(2)(B)(ii), this exception refers to the former version of § 1158(a), which specified only one discretionary decision: whether or not to grant asylum.

But *Wilkinson*'s core holding—that we retain jurisdiction to review mixed questions of law and fact under § 1252(a)(2)(D)—permits us to review those legal issues even when the INA makes them discretionary. Therefore, despite our rejection of *Ramadan*'s premise, we reaffirm its conclusion that we have jurisdiction to review determinations under § 1158(a)(2)(D).

On the merits, Ruiz's claims do not warrant relief. Substantial evidence supports the BIA's denial of withholding of removal and protection under the Convention Against Torture ("CAT"), and the BIA did not abuse its discretion in denying Ruiz's motion for administrative closure. Therefore, we deny the petition for review as to those claims.

## I.

Ruiz grew up in Nicaragua in the late 1970s and early 1980s during the conflict between the Sandinistas and the Somoza regime. Most of his family members supported the ruling Nationalist Liberal Party, and his aunt and uncle were close to top officials in the administration. After the Sandinistas seized power in 1979, they began to harass, interrogate, and threaten to kill members of Ruiz's family who did not collaborate with them.

When Ruiz was four years old, a Sandinista militant killed his father on the street in Managua for criticizing Sandinista policies. His mother demanded that the Sandinista authorities investigate, but they told her to forget about her husband's death and threatened to kill her. Members of Sandinista organizations came to Ruiz's home, yelled at his mother, and spraypainted the walls with threats against the family.

Ruiz and his siblings experienced problems in school when they were forced to join the Sandinista youth organization, which their mother opposed. When Ruiz was five or six years old, he was forced to dig trenches to prepare for air raids. On his way to school, he would walk past the burned remains of persons who had served in the Somoza military or had opposed the Sandinista government; they had been left on the side of the road as a warning.

The Sandinista authorities threatened Ruiz's aunt with death and confiscated her land and property. Sandinista troops killed Ruiz's cousin in Pantasma, Nicaragua. Ruiz's uncle fled the country, and state security forces repeatedly interrogated Ruiz's mother about him.

Ruiz's mother moved the family to her hometown of Matagalpa. Even there, however, Sandinista officials continued to interrogate her and threatened her with lifetime imprisonment if she did not cooperate. After two years, Ruiz and his family returned to Managua.

In 1984, when Ruiz was nine, he and his family moved to the United States. In 1994, his mother's asylum application was denied, and the family returned to Nicaragua. Around the same time, the Immigration and Naturalization Service ("INS") sent Ruiz an order to show

cause, eventually obtaining a deportation order in absentia when he failed to appear at scheduled hearings.[1]

Ruiz stayed in Nicaragua for the next two years. His mother remained there until 2001, when she moved to Spain. As of 2002 or 2003, his sister was married and still living in Nicaragua.

In 1996, Ruiz moved to Guatemala, where he spent the next decade. He married a Guatemalan woman, and they had a child together. In 2001, he visited his mother in Nicaragua for 15 days. He returned to Nicaragua for three or four days in 2005 to obtain a driver's license. In 2006, after his marriage failed, Ruiz moved to the United States, settling in Oregon.

Ruiz moved in with his current wife, Jennifer, in 2008. For most of their relationship, Ruiz struggled with a drinking problem. In 2012, he was convicted of driving under the influence ("DUI") and transferred to DHS custody. However, an immigration judge rescinded the outstanding deportation order and terminated the proceedings, finding that the government's attempt to serve Ruiz with the order to show cause had been unsuccessful. Ruiz was convicted of additional DUIs in 2016 and 2019. While jailed on the latter charge, he was again transferred to DHS custody.

---

[1] Prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), the INA used the term "deportation" rather than "removal," *see Vartelas v. Holder*, 566 U.S. 257, 262 (2012), and provided for an "order to show cause" rather than a "notice to appear" as the case-initiating document, *see Niz-Chavez v. Garland*, 593 U.S. 155, 167 (2021). The INS was replaced by the Department of Homeland Security ("DHS") pursuant to the Homeland Security Act of 2002. *See Flores v. Rosen*, 984 F.3d 720, 728 (9th Cir. 2020).

DHS served Ruiz with a notice to appear charging that he is removable for being unlawfully present in the United States. Ruiz admitted the allegations and conceded removability but applied for asylum, withholding of removal, and CAT protection.[2] He claimed that he would be persecuted in Nicaragua for being a member of his father's family and because his father's political opinion would be imputed to him.

The IJ denied relief. The IJ concluded that Ruiz's trauma did not qualify as an extraordinary circumstance excusing the untimely asylum application. As for withholding of removal, the IJ found that Ruiz's childhood experiences in Nicaragua did not amount to past persecution, the harm he experienced was not on account of a protected ground, and the circumstances in Nicaragua have materially changed such that a presumption of future persecution would be inappropriate regardless. The IJ found that Ruiz's claim of future persecution was speculative given that he has repeatedly returned to Nicaragua unharmed, has never been politically active, and can relocate internally within the country. For similar reasons, the IJ found that any risk of torture was speculative, precluding CAT relief.

During the pendency of his appeal to the BIA, Ruiz married Jennifer, U.S. Citizenship and Immigration Services ("USCIS") approved Jennifer's petition for alien relative,

---

[2] In his brief to the IJ, Ruiz requested only withholding of removal and CAT relief, and at the merits hearing, counsel conceded Ruiz's ineligibility for asylum due to the one-year bar. The IJ, however, construed Ruiz's application to include an asylum claim and analyzed his eligibility for an exception to the time bar.

and Ruiz moved for administrative closure so that he could seek permanent residency.[3]

The BIA denied Ruiz's motion for administrative closure and dismissed the appeal. The BIA denied administrative closure due to DHS's objections and the BIA's view that administrative closure is unnecessary for Ruiz to obtain a provisional unlawful presence waiver—the first step toward adjusting his status. The BIA affirmed the IJ's ruling that Ruiz's trauma was not an extraordinary circumstance justifying a 13-year delay in applying for asylum. And the BIA agreed with the IJ's reasons for denying withholding of removal and CAT protection.

We have jurisdiction to review the final order of removal, including the administrative closure decision, pursuant to 8 U.S.C. § 1252. *See Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 893 (9th Cir. 2018). We review the agency's factual findings for substantial evidence and its legal determinations de novo. *See id.* at 889. We review administrative closure decisions for abuse of discretion. *See Marquez-Reyes v. Garland*, 36 F.4th 1195, 1208–09 (9th Cir. 2022).

## II.

The INA provides that "[a]ny alien who is physically present in the United States . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). But there are conditions. Relevant

---

[3] The BIA proceedings were protracted by intervening proceedings here. Initially, the BIA summarily dismissed Ruiz's appeal for failure to specify any grounds. Ruiz petitioned for review, arguing that he never received a copy of the IJ's decision. We granted the government's motion to remand so that the BIA could serve Ruiz a copy of the decision and issue a new briefing schedule. *See Ruiz v. Garland*, No. 20-71169 (9th Cir. July 13, 2021).

here, the alien must "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year . . . of the alien's arrival in the United States." *Id.* § 1158(a)(2)(B). This one-year limit is subject to exceptions, such as when the applicant can show changed or extraordinary circumstances. *See id.* § 1158(a)(2)(D).

Ruiz contends that the BIA erred in determining that he did not show extraordinary circumstances. Before addressing this contention, we must consider whether we have jurisdiction to review the BIA's finding. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . .").

## A.

### 1.

The INA purports to bar judicial review of determinations regarding the one-year limit and its exceptions: "No court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]." 8 U.S.C. § 1158(a)(3). Despite this seemingly clear directive, *Ramadan* held that we have jurisdiction to review a "changed circumstances" determination. *See* 479 F.3d at 650. In *Husyev*, we extended this holding to an "extraordinary circumstances" determination because *Ramadan*'s reasoning "necessarily applies to both." *Husyev*, 528 F.3d at 1180.

*Ramadan* reached its holding in two steps. The first concerns the REAL ID Act's restoration of our jurisdiction to review "questions of law." 8 U.S.C. § 1252(a)(2)(D). In light of this change, *Ramadan* explained, we have

jurisdiction to review legal questions notwithstanding "any other provision of [the INA] . . . which limits or eliminates judicial review." *Ramadan*, 479 F.3d at 650 n.3 (quoting 8 U.S.C. § 1252(a)(2)(D)). Thus, the limitation on judicial review in § 1158(a)(3) no longer "precluded our review of [every] determination relating to the application of the one-year bar." *Id.* at 650. In particular, our jurisdiction to review questions of law "extends to questions involving the application of statutes or regulations to undisputed facts, sometimes referred to as mixed questions of fact and law," *id.*, which include "the existence of changed circumstances which materially affect the applicant's eligibility for asylum," 8 U.S.C. § 1158(a)(2)(D); *see Ramadan*, 479 F.3d at 650.

The second step of *Ramadan*'s analysis concerned whether the "changed circumstances" determination, though involving a mixed question of fact and law, was nonetheless discretionary. The INA provides—with exceptions we will discuss—that "no court shall have jurisdiction to review" any "decision or action" that Title II of the INA specifies "to be in the discretion of the Attorney General."[4] 8 U.S.C. § 1252(a)(2)(B), (B)(ii).

---

[4] We retain jurisdiction to review discretionary decisions where the authorization lies outside Title II, 8 U.S.C. §§ 1151–1382. *See, e.g.*, *Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1246 (9th Cir. 2008) (per curiam) (holding that "§ 1252(a)(2)(B)(ii) does not strip jurisdiction over petitions challenging an IJ's discretionary denial of a continuance" because an IJ's "authority to continue a case is not 'specified under'" Title II (quoting *Alsamhouri v. Gonzales*, 484 F.3d 117, 122 (1st Cir. 2007))); *see also Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("[T]he key words 'specified under this subchapter' refer to statutory, but not to regulatory, specifications." (quoting 8 U.S.C. § 1252(a)(2)(B)(ii))).

The question of discretion arose because of how Congress wrote the exception for changed or extraordinary circumstances. To qualify, an asylum applicant must show changed or extraordinary circumstances "to the satisfaction of the Attorney General." 8 U.S.C. § 1158(a)(2)(D). *Ramadan* held that "[t]he words 'to the satisfaction of the Attorney General' do not render the changed circumstances determination discretionary." *Ramadan*, 479 F.3d at 655.

Normally, this holding would bind us. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that panels must follow circuit law unless intervening higher authority "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). Here, the government argues that *Wilkinson* "is clearly irreconcilable with the reasoning of . . . *Ramadan* and *Husyev*." We agree.

**2.**

The Supreme Court in *Wilkinson* left no doubt that the "extraordinary circumstances" determination involves discretion. To the extent we held otherwise in *Ramadan*, that holding is clearly irreconcilable with *Wilkinson*. *Wilkinson* concerned the hardship determination required for cancellation of removal. That statute provides in relevant part that:

> The Attorney General may cancel removal of . . . an alien who is inadmissible or deportable from the United States if the alien . . . establishes that removal would

result in exceptional and extremely unusual
hardship . . . .

8 U.S.C. § 1229b(b)(1), (b)(1)(D).  Although the ultimate
decision whether to grant relief is discretionary—the
Attorney General "may" cancel removal, and "the word
'may' *clearly* connotes discretion," *Bouarfa v. Mayorkas*,
604 U.S. 6, 13–14 (2024) (quoting *Biden v. Texas*, 597 U.S.
785, 802 (2022)); *see Wilkinson*, 601 U.S. at 218 ("Section
1252(a)(2)(B)(i) . . . strips courts of jurisdiction over a
'judgment' on cancellation of removal.")—the threshold
hardship question contains no such discretionary language.

Addressing this absence of discretionary language, the
government pointed out that the statute previously had
included it; relief was "available only to a 'person whose
deportation would, *in the opinion of the Attorney General*,
result in exceptional and extremely unusual hardship.'"
*Wilkinson*, 601 U.S. at 224 (quoting INA, Pub. L. No. 82-
414, § 244(a)(1), 66 Stat. 163, 214 (1952)).  The Court
accepted that the former wording signaled discretion, but it
declined to "read that discretion back into the current version
of the statute." *Id.*  That is "because Congress chose to retain
similar language in provisions governing other forms of
discretionary relief subject to § 1252(a)(2)(B)'s bar on
judicial review," *id.*, indicating that its omission in
§ 1229b(b)(1) was intentional.

Two of *Wilkinson*'s examples of discretionary
provisions that survived are worded similarly to the
"extraordinary circumstances" provision.  The first concerns
waiver of certain criminal bars to admissibility:

The Attorney General *may*, in his discretion,
waive the application of [the bars] if . . . it is

established *to the satisfaction of the Attorney General* that the alien's denial of admission would result in extreme hardship . . . .

8 U.S.C. § 1182(h), (h)(1)(B) (emphases added). The second concerns waiver of a misrepresentation-based bar to admissibility:

> The Attorney General *may*, in the discretion of the Attorney General, waive the application of [the bar] . . . if it is established *to the satisfaction of the Attorney General* that the refusal of admission to the United States of such immigrant alien would result in extreme hardship . . . .

*Id.* § 1182(i)(1) (emphases added). And for comparison, the statute at issue here:

> An application for asylum of an alien *may* be considered . . . if the alien demonstrates *to the satisfaction of the Attorney General* either the existence of changed circumstances . . . or extraordinary circumstances . . . .

*Id.* § 1158(a)(2)(D) (emphases added).

Structurally, the three provisions are identical. Each uses the word "may" to convey that the ultimate decision about relief is discretionary. More importantly, in each provision, the threshold showing necessary for relief is modified by the phrase "to the satisfaction of the Attorney General." This phrase shows that even the threshold determination is discretionary.

### 3.

In concluding that "to the satisfaction of the Attorney General" does "not render the changed circumstances determination discretionary," *Ramadan* explained that "this phrase is a specification of *who* is to make the decision, rather than a characterization of that decision itself." 479 F.3d at 655. We provided three justifications for this characterization, but none is compatible with *Wilkinson*.

First, *Ramadan* reasoned that "to the satisfaction of the Attorney General" means something different than "in the discretion of the Attorney General." *Ramadan* explained that "when Congress wants to place something within the Attorney General's discretion, it either uses that word or a phrase that the courts have held to function in this way." *Id.* But *Wilkinson* made clear that "to the satisfaction of the Attorney General" is a phrase that "function[s] in this way." *Id.*

Second, *Ramadan* compared § 1158(a)(2)(D) to an identically structured statute, 8 U.S.C. § 1182(h)(1)(A), and posited that "may" would be superfluous if "to the satisfaction of the Attorney General" already conveyed discretion. 479 F.3d at 655–56. But *Wilkinson*'s examples of discretionary statutes—including § 1182(h)(1)(B)—have the same structure. And we need not assume that this structure creates surplusage. More likely, Congress wanted to accomplish two different goals while emphasizing the Attorney General's discretion in making each determination. On the one hand, Congress wanted to limit consideration of untimely asylum applications to only those involving changed or extraordinary circumstances. On the other hand, Congress recognized that applicants who can make this threshold showing might be unsuitable for relief for other

reasons; it gave the Attorney General discretion to deny such applications.

Third, *Ramadan* relied on our precedent, *Kalaw v. INS*, 133 F.3d 1147, 1150–52 (9th Cir. 1997), which, coincidentally, analyzed the prior version of the statute at issue in *Wilkinson*.  *See Ramadan*, 479 F.3d at 656.  *Kalaw* concerned the statutory elements of suspension of deportation—the precursor to cancellation of removal.  It held, consistent with *Wilkinson*, that some requirements presented legal questions, subject to judicial review, even though "the statute explicitly designated the overall determination to be discretionary."  *Ramadan*, 479 F.3d at 656.  Crucially, *Kalaw* also held that one "statutory requirement, 'extreme hardship,' is clearly a discretionary act" because the statute "commit[ted] the determination to 'the opinion of the Attorney General.'"  *Kalaw*, 133 F.3d at 1152 (quoting 8 U.S.C. § 1254(a)(1) (1996)).  As *Wilkinson* made clear through the statutory comparisons, "the opinion of the Attorney General" is functionally equivalent to "the satisfaction of the Attorney General."

We therefore hold that insofar as *Ramadan* held that the determination of changed or extraordinary circumstances does not involve discretion, it is clearly irreconcilable with *Wilkinson*.  But that does not resolve our jurisdictional inquiry, because not all discretionary decisions are unreviewable.

## B.

That brings us to § 1252(a)(2)(B)'s exception to the general prohibition on review of discretionary decisions:

[N]o court shall have jurisdiction to review—

> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, *other than the granting of relief under section 1158(a) of this title*.

8 U.S.C. § 1252(a)(2)(B) (emphasis added).

Both the Supreme Court and our court have assumed that § 1252(a)(2)(B)(ii) references § 1158(a) to permit review of discretionary asylum denials. *See Kucana*, 558 U.S. at 247 n.13 ("Absent the exception, asylum applicants might fall within § 1252(a)(2)(B)(ii)'s jurisdictional bar because a statutory provision, § 1158(b)(1)(A), specifies that 'the Attorney General *may* grant asylum.'"); *Morales v. Gonzales*, 478 F.3d 972, 979 (9th Cir. 2007) ("[B]ecause decisions whether to grant asylum are exempted from § 1252(a)(2)(B)(ii)'s jurisdiction-stripping mandate, we have jurisdiction to review the IJ's denial of [an] asylum application."), *abrogated on other grounds*, N-A-M-, 24 I. & N. Dec. 336, 343–44 (B.I.A. 2007), *as recognized in*, *Anaya-Ortiz v. Holder*, 594 F.3d 673, 678 (9th Cir. 2010); *Hosseini v. Gonzales*, 471 F.3d 953, 956 (9th Cir. 2006) (same). The legislative history confirms that Congress intended such a result. *See* H.R. Rep. No. 104-828, at 219 (1996) (Conf. Rep.) (describing the exception as applicable to "a discretionary judgment whether to grant asylum").

But asylum is granted under § 1158(b), not § 1158(a), so that interpretation of § 1252(a)(2)(B)(ii) is unmoored from the statutory text. *See* 8 U.S.C. § 1158(b)(1)(A); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 758 (9th Cir. 2018) ("Where § 1158(a) governs who may *apply* for asylum, the remainder of § 1158 delineates the process by which applicants may be *granted* asylum.").

Plainly, Congress made a drafting error, a mistake that it repeated elsewhere in the statute. *See, e.g.*, 8 U.S.C. § 1252(b)(4)(D) ("[T]he Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion."). Congress's intent is clear. When Congress enacted § 1252(a)(2)'s jurisdiction-stripping provisions in IIRIRA, *see* Pub. L. No. 104-208, div. C, § 306(a)(2), 110 Stat. 3009, 3009-607 (1996), it also rewrote the asylum statute; prior to IIRIRA, § 1158(a) had a broader focus that included both application procedure and discretionary relief:

> The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, *and the alien may be granted asylum in the discretion of the Attorney General* if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

8 U.S.C. § 1158(a) (1994) (emphasis added).

IIRIRA was the product of multiple proposals for immigration reform. The one-year limit on asylum claims that led to § 1158(a)'s current form originated in both houses of Congress. *See* S. 1664, 104th Cong. § 194 (1996); H.R. 2202, 104th Cong. § 531(a) (as reported by H. Comm. on Agric., Mar. 8, 1996); H.R. Rep. No. 104-828, at 245–46 (1996) (Conf. Rep.). The initial version of the House bill, which ultimately became law, reworked § 1158(a) but did not include § 1252's jurisdiction-stripping provision for discretionary decisions. *See* H.R. 2202, 104th Cong. §§ 306(a)(2), 526(a) (as introduced in House, Aug. 4, 1995). That change—including the exception for § 1158(a) decisions—was introduced later by the Senate. *See* H.R. 2202, 104th Cong. § 142(a) (as passed by Senate, May 2, 1996). Thus, § 1252(a)(2)(B)(ii)'s reference to "section 1158(a)" plainly reflects Congress's failure to reconcile the two parallel changes with one another. In other words, § 1252(a)(2)(B)(ii) refers to the pre-IIRIRA version of § 1158(a), which contained only one form of discretionary relief—the ultimate decision whether to grant or deny asylum, which is now codified in § 1158(b).

We therefore conclude that "changed circumstances" determinations under § 1158(a) do not fall within § 1252(a)(2)(B)(ii)'s exception authorizing review of discretionary determinations "under section 1158(a)." But that still does not end our jurisdictional inquiry, because *Ramadan* conflicted with prior Ninth Circuit precedent that we must now consider.

## C.

Section 1252(a)(2)(B) has another exception—it prohibits review of discretionary decisions "except as provided in subparagraph (D)." Section 1252(a)(2)(D)

provides that the INA's limitations on judicial review in § 1252(a)(2)(B) do not "preclud[e] review of constitutional claims or questions of law." *Wilkinson* held that "[m]ixed questions of law and fact, even when they are primarily factual, fall within the statutory definition of 'questions of law' in § 1252(a)(2)(D) and are therefore reviewable." *Wilkinson*, 601 U.S. at 225.

In *Afridi v. Gonzales*, we held that "the REAL ID Act grants jurisdiction to appellate courts to review questions of law presented in petitions for review of final orders of removal, *even those pertaining to otherwise discretionary determinations*." 442 F.3d 1212, 1218 (9th Cir. 2006) (emphasis added), *overruled on other grounds by*, *Estrada-Espinoza v. Mukasey*, 546 F.3d 1147, 1160 n.15 (9th Cir. 2008) (en banc). A year later, *Ramadan* stated that the REAL ID Act "does not restore jurisdiction over discretionary determinations." 479 F.3d at 654.

In *Husyev*, we acknowledged this inconsistency but had no reason to resolve it given that, under *Ramadan*'s reasoning, the "extraordinary circumstances" issue is not discretionary. 528 F.3d at 1179–80. But because we now conclude the issue *is* discretionary, we must resolve the conflict between *Ramadan* and *Afridi*.

*Ramadan* provided neither reasoning nor authority for the proposition that the Attorney General's legal conclusions are unreviewable if the INA designates them as discretionary. We normally treat such passing statements as nonbinding dicta. *See Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024); *see also United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("[W]e are not bound by a prior panel's comments 'made casually and without analysis . . . as a prelude to another legal issue that commands the panel's

full attention.'" (citation modified) (quoting *United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007))).

In holding that we *can* review the Attorney General's legal conclusions pertaining to discretionary determinations, *Afridi* relied on the REAL ID Act's "plain language" and a prior case that, like *Wilkinson*, involved legal questions regarding the hardship determination for cancellation of removal. *See Afridi*, 442 F.3d at 1218 (citing *Cabrera-Alvarez v. Gonzales*, 423 F.3d 1006, 1009 (9th Cir. 2005)).

Neither *Afridi* nor *Cabrera-Alvarez* nor *Wilkinson* resolves the precise question here, because all three cases involved antecedent legal questions that the INA did not commit to the Attorney General's discretion. *See also Magana-Magana v. Bondi*, 129 F.4th 557, 567–71 (9th Cir. 2025) (exercising jurisdiction to review nondiscretionary "extraordinary circumstances" determination where the Attorney General had discretion to grant the ultimate relief—consideration of an untimely motion to reopen brought by a battered spouse (construing 8 U.S.C. § 1229a(c)(7)(C)(iv)(III))).

We recently considered our jurisdiction when both the threshold and ultimate determinations are discretionary. By default, the INA requires noncitizens convicted of certain crimes to be held in custody. *See* 8 U.S.C. § 1226(c)(1). But "[t]he Attorney General *may* release [the] alien . . . only if," among other things, "the alien *satisfies the Attorney General* that the alien will not pose a danger to the safety of other persons or of property." 8 U.S.C. § 1226(c)(4) (formerly codified at 8 U.S.C. § 1226(c)(2)) (emphasis added). Originally, we held that the Attorney General's dangerousness determination is an unreviewable matter of discretion, *see Martinez v. Clark*, 36 F.4th 1219, 1230 (9th

Cir. 2022), but the Supreme Court vacated our decision and remanded for reconsideration in light of *Wilkinson*,[5] *see Martinez v. Clark*, 144 S. Ct. 1339 (2024).

On remand, we held that "*Wilkinson* compels the conclusion that application of the 'dangerousness' standard is a reviewable mixed question." *Martinez v. Clark* ("*Martinez II*"), 124 F.4th 775, 783 (9th Cir. 2024). The government argued that the dangerousness determination was akin to the unreviewable "step two" determination in *Wilkinson*—i.e., the ultimate discretionary decision whether to grant or deny cancellation of removal—but we rejected the comparison. *Id.* at 784. We distinguished *Wilkinson*'s "step two" determination as "fully discretionary," *id.*, whereas the "dangerousness" standard "provide[s] multiple factors for an IJ to consider before making the ultimate determination," and "federal courts can 'assess whether an IJ correctly applied the statutory standard to a given set of facts.'" *Id.* at 783 (quoting *Wilkinson*, 601 U.S. at 221). Thus, "[e]ven though what constitutes 'dangerousness' is malleable and involves agency discretion," it "is still a legal standard." *Id.* So too here.

The "extraordinary circumstances" determination requires consideration of specific factors showing that the circumstances caused the delay and that the asylum applicant's own conduct neither contributed to the

---

[5] *Martinez* considered the jurisdictional limitation in § 1226(e)—which provides that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review"—rather than the general limitation on review of discretionary decisions in § 1252(a)(2)(B)(ii). This difference is not material, however, because § 1252's restoration of jurisdiction to review legal questions applies to "any . . . provision of [the INA] (other than this section) which limits or eliminates judicial review." 8 U.S.C. § 1252(a)(2)(D).

circumstances nor prolonged the delay. *See* 8 C.F.R. § 208.4(a)(5). The regulation provides six illustrative examples, *id.* § 208.4(a)(5)(i)–(vi), requiring a legal conclusion as to whether the circumstances at issue are comparable to those enumerated in the regulation. Thus, *Wilkinson* supports our conclusion in *Husyev* that the "extraordinary circumstances" issue "is how the statute and regulation apply to [the] facts" of the case, which "presents a question of law not subject to the jurisdictional restriction of § 1158(a)(3)." *Husyev*, 528 F.3d at 1179; *see Wilkinson*, 601 U.S. at 222 (explaining that application of the hardship standard for cancellation of removal is a legal question because it "requires an IJ to evaluate a number of factors" despite also "requir[ing] a close examination of the facts.").

Nothing in *Wilkinson* suggests that discretionary mixed questions are unreviewable. When the Court discussed statutes that retained discretionary language for threshold questions, it did so to contrast them with the cancellation of removal statute, which had discretionary language removed in an amendment. Given Congress's evident intent to make the hardship determination *less* discretionary than in the past, the Court found the government's reliance on history "particularly unavailing." *Wilkinson*, 601 U.S. at 224. The Court explained that after the REAL ID Act restored jurisdiction to review legal questions, a "clear" rule governs the interaction between § 1252(a)(2)(B) and (D): "mixed questions of law and fact are always reviewable as questions of law under § 1252(a)(2)(D)." *Id.* at 218–19.

Of course, not all discretionary decisions implicate questions of law. For example, 8 U.S.C. § 1155 provides that the Secretary of Homeland Security "may, at any time," revoke an approved visa petition "for what he deems to be good and sufficient cause." As a discretionary decision, it is

shielded from review by § 1252(a)(2)(B)(ii). *See Bouarfa*, 604 U.S. at 9. And because the statute lacks any meaningful standard against which to judge the Secretary's decision, *see id.* at 14 ("Congress has in no way prescribed how that discretion must be exercised."), there is no legal issue that a court could review under § 1252(a)(2)(D), *see id.* at 11 n.2 (noting that even the party asserting jurisdiction to review visa revocations acknowledged § 1252(a)(2)(D)'s inapplicability).

Even when we have jurisdiction to review the Attorney General's discretionary application of a legal standard to the facts, our "review is deferential" if "[the] mixed question is primarily factual." *Wilkinson*, 601 U.S. at 225. That is the case here. The "fact-bound nature" of the "extraordinary circumstances" determination requires that "we apply a 'deferential standard of review,'" *Magana-Magana*, 129 F.4th at 572 (quoting *Wilkinson*, 601 U.S. at 222). As with other "fact-intensive mixed questions of this sort," we review the agency's decision "for substantial evidence." *Lemus-Escobar v. Bondi*, 158 F.4th 944, 954 (9th Cir. 2025) (citing *Gonzalez-Juarez v. Bondi*, 137 F.4th 996, 1000–03 (9th Cir. 2025)).

Therefore, we hold that we have jurisdiction to review—with deference—the Attorney General's "extraordinary circumstances" determination in § 1158(a)(2)(D) because, as we decided in *Husyev*, it presents a mixed question of law and fact.

## III.

We now turn to the merits of Ruiz's claims.

## A.

Ruiz argues that he established "extraordinary circumstances" preventing him from timely applying for asylum because his experiences in Nicaragua have "had long-term effects on his mental health." To establish extraordinary circumstances, an asylum applicant must show that: (1) "the circumstances were not intentionally created by [him] through his . . . own action or inaction"; (2) "those circumstances were directly related to [his] failure to file the application within the 1-year period"; and (3) "the delay was reasonable under the circumstances." 8 C.F.R. § 1208.4(a)(5).

Even if Ruiz could meet the first element necessary for relief—that the circumstances were not attributable to him—the BIA reasonably faulted his failure to explain "*how* his past trauma delayed the filing of his asylum application for 13 years" (emphasis added). Persecution often results from highly traumatic circumstances, but the direct relationship between Ruiz's trauma and his delay of more than a decade is not self-evident.

We do not suggest that trauma could never justify such a delay. The regulations recognize that mental illness or disability, "including any effects of persecution or violent harm suffered in the past," can constitute extraordinary circumstances. 8 C.F.R. § 208.4(a)(5)(i). But an asylum applicant must explain the relationship between his trauma and the delay. Without such an explanation, the BIA could only speculate whether the delay was reasonable. The BIA did not err by denying Ruiz's asylum application as untimely.

**B.**

Ruiz challenges the denial of his application for withholding of removal. An applicant for such relief has the burden of showing that he will be persecuted in the proposed country of removal—i.e., that his life or freedom would be threatened on account of a protected ground. *See* 8 C.F.R. § 1208.16(b). If the applicant shows that he has experienced persecution in the past, he is entitled to a presumption that he will be persecuted upon removal. *See id.* § 1208.16(b)(1)(i). The government can rebut this presumption by showing either "a fundamental change in circumstances" or the applicant's reasonable ability to avoid persecution "by relocating to another part of the proposed country." *Id.* § 1208.16(b)(1)(i)(A)–(B).

Even if we assume that Ruiz established past persecution, substantial evidence supports the BIA's conclusion that DHS rebutted the presumption of future persecution. Nicaragua has changed substantially since the Sandinistas harmed Ruiz and his family during the civil war in the late 1970s and early 1980s. That conflict ended in 1990 when an opposition candidate beat Sandinista incumbent Daniel Ortega to win the presidential election, and the new government began to investigate human rights abuses.

Ruiz and his family's experiences bear out these changed conditions as well as their ability to relocate within Nicaragua. After a 10-year absence, the family returned to the country in 1994. They moved to Jinotega and lived with Ruiz's mother's cousin. At the time, Sandinista appointees retained control of the security forces, but Ruiz suffered no harm during his two-year stay. In the years that followed, he returned twice more without incident—he even obtained a

driver's license from a government office.  His mother, who years earlier had received death threats from the Sandinistas, lived in Nicaragua uneventfully for seven years before moving to Spain.

Although Ortega returned to the presidency in 2007, and the country has experienced rising authoritarianism since that time, including government-sponsored torture of dissenters, Ruiz presented no evidence that the current government has an interest in harming him.  Ruiz claims he would face persecution on account of his familial relationship with his father and because his family's anti-Sandinista political opinion would be imputed to him, but his sister remained in Nicaragua, and there is no evidence that she experienced any threats.  "[T]he well-being of others who have stayed behind in a country is . . . relevant when those others are similarly situated."  *Zhao v. Mukasey*, 540 F.3d 1027, 1031 (9th Cir. 2008); *see also Abebe v. Gonzales*, 432 F.3d 1037, 1044 (9th Cir. 2005) (en banc).

Nor was the IJ required to accept Ruiz's testimony that he "would speak [his] mind out against the injustice that's being committed" in Nicaragua given that he has never been politically active anywhere.  *See Sarkar v. Garland*, 39 F.4th 611, 623 (9th Cir. 2022) (rejecting "speculative" statements as the basis for future persecution (quoting *Nagoulko v. INS*, 333 F.3d 1012, 1018 (9th Cir. 2003))); *see also Hoxha v. Ashcroft*, 319 F.3d 1179, 1185 (9th Cir. 2003) (rejecting claim of future persecution where persecution "was directed toward members of the political opposition" and the asylum applicant "[did] not have a history of political agitation").

Because the record does not compel the conclusion that Ruiz will face persecution in Nicaragua, the BIA did not err by denying withholding of removal.  *See Lopez v. Garland*,

116 F.4th 1032, 1046 (9th Cir. 2024).  For similar reasons, the BIA did not err by denying CAT relief.  *See Sarkar*, 39 F.4th at 623.

## C.

Ruiz also challenges the BIA's denial of his motion for administrative closure.  He seeks a green card—i.e., adjustment of his status to lawful permanent resident—based on his marriage to Jennifer, a U.S. citizen.  However, his unlawful presence in the United States bars him from such relief for 10 years, *see* 8 U.S.C. § 1182(a)(9)(B)(i)(II), unless the Attorney General waives the bar because it "would result in extreme hardship" to Jennifer, 8 U.S.C. § 1182(a)(9)(B)(v).  But Ruiz is ineligible to apply for a waiver while still in the United States "unless the removal proceedings are administratively closed and have not been recalendared."  8 C.F.R. § 212.7(e)(4)(iii).

Administrative closure is a tool for the IJ or BIA "to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the [immigration] court and may not occur for a significant or undetermined period of time."  Avetisyan, 25 I. & N. Dec. 688, 692 (B.I.A. 2012), *overruled by* Castro-Tum, 27 I. & N. Dec. 271 (Att'y Gen. 2018), *and reinstated by* Cruz-Valdez, 28 I. & N. Dec. 326 (Att'y Gen. 2021).

When the BIA evaluates a request for administrative closure, it considers "the totality of the circumstances," 8 C.F.R. § 1003.1(l)(3), including, as relevant:

> (A) The reason administrative closure is sought;

(B) The basis for any opposition to administrative closure;

(C) Any requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS;

(D) The likelihood the [noncitizen] will succeed on any petition, application, or other action that the [noncitizen] is pursuing, or that the [noncitizen] states in writing or on the record at a hearing that they plan to pursue, outside of proceedings before the [BIA];

(E) The anticipated duration of the administrative closure;

(F) The responsibility of either party, if any, in contributing to any current or anticipated delay;

(G) The ultimate anticipated outcome of the case pending before the [BIA]; and

(H) The ICE detention status of the [noncitizen].

*Id.* § 1003.1(*l*)(3)(i); *accord* Avetisyan, 25 I. & N. Dec. at 696.

Under the current regulation, "[n]o single factor is dispositive." 8 C.F.R. § 1003.1(*l*)(3). However, at the time the BIA adjudicated Ruiz's motion, "the primary consideration" was "whether the party opposing administrative closure ha[d] provided a persuasive reason for the case to proceed and be resolved on the merits." W-

Y-U-, 27 I. & N. Dec. 17, 20 (B.I.A. 2017), *superseded by* 8 C.F.R. § 1003.1(*l*)(3) *as stated in* Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46742, 46753 (May 29, 2024).

By citing to W-Y-U-, the BIA signaled that it found DHS's reason for opposing the motion—Ruiz's "criminal conduct and immigration history in the United States"—to be persuasive.[6] The BIA did not abuse its discretion in concluding that Ruiz's three DUI convictions weighed against relief. Nor did the BIA abuse its discretion in considering Ruiz's immigration history.

Ruiz faults the BIA for failing to consider evidence he presented regarding his eligibility for a provisional unlawful presence waiver. Although the BIA must "weigh all relevant factors presented in the case, including . . . the likelihood the [noncitizen] will succeed on any petition, application, or other action he . . . is pursuing outside of removal proceedings," administrative closure is inappropriate to await "an event or action that may or may not affect the course of an alien's immigration proceedings." Avetisyan, 25 I. & N. Dec. at 696.

The BIA concluded that Ruiz "does not need to have his removal proceedings administratively closed to be able to apply for a provisional unlawful presence waiver" because

---

[6] Ruiz argues that the BIA should not have considered DHS's untimely opposition, but the BIA has discretion to "consider a brief filed out of time" in other contexts, 8 C.F.R. § 1003.2(g)(3) (reopening or reconsideration), and it has inherent authority to exercise this discretion in the context of administrative closure, *see* 8 C.F.R. § 1003.1(d)(1)(ii) ("[The BIA] may take any action consistent with [its] authorities under the [INA] and the regulations as necessary or appropriate for the disposition or alternative resolution of the case.").

the regulations provide for an alternative procedure. When the BIA dismissed Ruiz's appeal, the order of removal became administratively final, *see* 8 U.S.C. § 1101(a)(47)(B)(i); 8 C.F.R. § 1241.1(a), permitting Ruiz to apply for a conditional unlawful presence waiver once he obtained consent to reapply for admission after removal, *see* 8 U.S.C. § 1182(a)(9)(A)(iii); 8 C.F.R. §§ 212.2(j), 212.7(e)(4)(vi). Ruiz does not argue that this alternative procedure is unavailable to him. The BIA's conclusion that administrative closure would not affect Ruiz's immigration proceedings was not arbitrary, irrational, or contrary to the law. *See Singh v. Garland*, 117 F.4th 1145, 1150 (9th Cir. 2024).

**PETITION DENIED.**